**In re VIENNA PARK PROPERTIES,
a limited Partnership, Debtor.**

**Bankruptcy No. 89–B–12967 (CB).**

United States Bankruptcy Court,
S.D. New York.

Oct. 4, 1991.

See also 128 B.R. 373.

Stroock & Stroock & Lavan by Fred S. Hodara, Lisa Beckerman–Stenlake, New York City, for the Resolution Trust Corp., as conservator for Trustbank Federal Sav. Bank, and United Postal Sav. Ass'n.

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

This matter comes to this Court pursuant to a motion (the "Motion") by Vienna Park Properties (the "Debtor"), under section 506(a) of the Bankruptcy Code (the "Code"), seeking a determination of the current value of a 300 unit garden apartment complex (the "Property") located in Vienna, Virginia. The Property is the Debtor's principal asset. The secured creditors, consisting of Resolution Trust Corporation, as conservator for Trustbank Federal Savings Bank, and United Postal Savings Association (the "Secured Creditors"), object to the Debtor's determination of valuation.

A trial on the Motion was commenced on April 26, 1991, and was continued on April 29, 1991, May 20, 1991 and May 31, 1991 (collectively, the "Trial").[1] Prior to the Trial, both parties hired appraisers who completed appraisal reports. The Debtor's appraisal, admitted into evidence as Exhibits 5 and 5A, has been referred to as the "2nd RERC Appraisal". The Debtor's appraiser, Real Estate Research Corporation ("RERC") completed an initial appraisal report in November, 1989 (the "1st RERC Appraisal") which was admitted into evidence as Exhibit 8. The Secured Creditors' appraisal, admitted into evidence as Exhibit 11, has been referred to as the "Harvey Update." William C. Harvey & Associates ("Harvey") had also previously appraised the property in March, 1990 (the "1st Harvey Appraisal") which appraisal was admitted into evidence as Exhibit 11A.

William C. Harvey of Harvey testified at Trial on behalf of the Secured Creditors. James Britton of RERC testified at Trial on behalf of the Debtor, as did Dan Wudske of Grady Management ("Grady"), the manag-

Glass & Eckstein, P.C., a member of the firm Tenzer, Greenblatt, Fallon & Kaplan by James D. Glass, Andrew B. Eckstein, New York City, for debtor.

---

1. Citations to the transcripts of the Trial are reflected as "Tr." followed by the date of the relevant transcript volume and the page number containing the referenced citation.

ing agent of the Property. Messrs. Harvey and Britton were each qualified as expert appraisers. Tr. 4/29/91 at 28–31; Tr. 5/20/91 at 204. Mr. Wudske was qualified as an expert in the field of property management and related matters. Tr. 4/26/91 at 37–47.

In their current and prior reports, both appraisers analyzed the "cost approach," the "sales comparison approach" and the "income capitalization approach" in valuing the Property. Both appraisers conclude that the "income capitalization approach" is the most reliable valuation method for the Property. *See* Tr. 4/29/91 at 78–9; Tr. 5/20/91 at 220. Pursuant to this approach Harvey valued the Property at $15,500,000 and RERC valued the Property at $15,300,-000. Harvey Update at 25; 2nd RERC Appraisal at 74. However, RERC concluded that, because the condition of the Property was substantially more deteriorated than comparable projects and required virtually immediate corrective measures involving the prompt expenditure of $2,000,-000, such condition warranted a diminution in the appraised value by that amount. As a result, RERC concluded that the value of the Property should be $13,300,000.

The crux of the dispute between the Secured Creditors and the Debtor lies in Mr. Britton's $2,000,000 deduction. The Secured Creditors' argue that such a deduction is arbitrary and improper under modern appraisal practice because:

(a) A deduction for "deferred maintenance" is improper under modern appraisal practice; expenditures that are required in respect of deferred maintenance can be made from a value derived pursuant to an income capitalization analysis only if the amount of the expenditure can be recouped, *i.e.*, only if the expenditure is economically feasible;

(b) the deductions made by Mr. Britton for "deferred maintenance" results in "double dipping" since the derived value of the Property had already been adjusted to account for the Property's condition relative to comparable rental properties prior to the deduction of the $2,000,000;

(c) the $2,000,000 amount was uncritically adopted by Mr. Britton from the statements by the Property's controlling party—Brookhill Management.

The Secured Creditors also believe that Mr. Britton made other serious errors. Because of the alleged errors made by Mr. Britton, the Secured Creditors believe that the 2nd RERC Appraisal is not as credible as the Harvey Update.

### THE PROPERTY

The fact that the Property is in poor condition is not disputed. Tr. 5/22/91 at 240. In the Harvey Update, the Property is described as being in "fair to average condition." Harvey Update at 39. Indeed, it was because of the failure of the former property management agent, GLM Corporation ("GLM") to provide the proper maintenance services that the Debtor refused to renew GLM's contract and instead hired Grady in 1989. It is quite apparent that because of GLM's 5 year tenure, the Property is presently in a state manifesting neglect.

Upon Grady's retention, comprehensive property management services were performed. As a matter of standard course, Grady independently conducts market surveys and property inspections to assist it in sub-managing the Property. As an extension of its property management services and pursuant to Order of this Court dated November 2, 1990, in March 1991, Grady produced a three (3) volume asset and market analysis (the "Grady Analysis") containing voluminous demographic information, a thorough report on the condition of the Property and suggested rehabilitation programs. The Analysis was admitted into evidence at the Trial as Exhibits 3–A, 3–B and 3–C. Grady bid out the cost of the proposed rehabilitation programs. Detailed bids received by Grady were introduced into evidence as Exhibits 4–A through 4–T. To date, the Debtor has been able to implement only minor repairs due the unavailability of funds.[2]

---

**2.** The reason for the unavailability of funds is

closely linked to an appeal presently pending

## DISCUSSION

### A. *Section 506(a)*

Under § 506(a) of the Code "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...." 11 U.S.C. § 506(a). The value of the property "shall be determined in light of the *purpose* of the valuation and of the proposed disposition or use of such property...." *Id.* (emphasis added).

In the present case, the reasons for pursuing the valuation are twofold:

1. to facilitate this Court's determination of the Secured Creditors' motion for relief from the automatic stay, pursuant to § 362(d) of the Code; and

2. to enable the Debtor to properly address the Secured Creditors' claims under a chapter 11 plan of reorganization, pursuant to which it will be proposed that the Property be retained and operated by the Debtor.

■ The Debtor correctly states that in performing a valuation under § 506(a), the age, condition and location of the property should be considered. The Secured Creditors do not contest this. The Debtor cites a series of cases for the proposition that "[a]djustments to the appraised value of real property based upon (a) the market conditions, (b) condition of the property, and/or (c) the cost to repair same, have been recognized by the Courts as proper in conducting a valuation." Debtor's Memorandum at 17. The Debtor then cites four cases in support of its argument. *See In re 6200 Ridge, Inc.,* 69 B.R. 837 (Bankr. E.D.Pa.1988); *In re Crompton,* 68 B.R. 831 (Bankr.E.D.Pa.1987); *In re Windfeller,* 82 B.R. 367 (Bankr.E.D.Pa.1988); *In re Courtright,* 57 B.R. 495 (Bankr.Or.1986). In all of those cases, the condition of the subject property rendered it untenable without the immediate repair, the cost of which was deducted from the sales price.

before the District Court for the Southern District of New York, pertaining whether certain

The Debtor does not claim that the Property is untenable in its current condition. Instead, the proposed $2,000,000 renovation project goes to the improvement of the Property to achieve a higher rental income. Therefore, the aforementioned cases are not applicable in the case *sub judice.* Additionally, valuation is case specific. It has been conceded that in determining value, the current condition of the Property must be taken into account. The heart of the controversy lies in *how* the current condition is to be taken into account. This is best answered by looking at modern appraisal practices to determine the best and proper accounting of the Property's current condition. This is even more appropriate in the case, *sub judice,* because this Court is faced with two different appraisal reports.

■ The Debtor claims that liquidation costs should be factored into the valuation of the Property. This Court need not determine whether it is appropriate to deduct liquidation costs because the Debtor has failed to adduce any evidence at trial on the nature or amount of costs of liquidation of the Property. Only the actual costs of the transfer or disposition can be deducted, from the value of the Property. In these circumstances, this Court will not assume an amount.

### B. *The Direct Capitalization Approach Versus the DCF Approach*

When conducting an income capitalization analysis, the projected net operating income of a subject property can be derived by two different methods: the direct capitalization method and the discounted cash flow method ("DCF"). The difference between these two methods is the time period over which the projection is made. In other words, the direct capitalization method covers a short period of time (a "snapshot") whereas the DCF method covers a longer period of time.

■ Before addressing the $2,000,000 deduction, this Court will first consider the

rents constitute cash collateral.

Secured Creditors' argument that Mr. Britton improperly utilized the direct capitalization approach in determining value under the income capitalization method. The Secured Creditors rely on the DCF method utilized by Harvey which yielded a value of $15,500,000. Harvey also did a direct capitalization analysis, which yielded a value of $14,700,000, but ultimately chose to rely on his DFC model as the better indicator of value.

The attack by the Secured Creditors goes to the Mr. Britton's judgment in choosing between the two methods. Indeed, the Secured Creditors concede that both methods are "acceptable valuation methods," but nevertheless claim that the DCF method is preferable because it analyzes a ten-year period of the rental income stream, vacancy rate and net operating income of the Property. Secured Creditors' Reply Memorandum at 35. At trial Mr. Britton provided a logical explanation for his choice of methods. Mr. Britton concluded that the DCF approach on residential properties subject to one year leases, as the Property is, is a less desirable approach due to the lack of certainty of (a) rental rates, (b) occupancy and (c) inflation over a prolonged projected period. Accordingly, he concluded that a realistic purchaser, rather than basing a decision on value upon such speculative projections, would rely on the "here and now" circumstances. Mr. Britton also concluded that his approach was very appropriate in light of the fact that the Property requires significant repairs and rehabilitation which creates uncertainties. Tr. 4/29/91 at 85–89; Tr. 5/20/91 at 179.

The Secured Creditors suggest that because Mr. Britton had used the DCF in fifteen of the last twenty multi-family appraisals that he performed, that it is the proper method to utilize in this instance. The Secured Creditors, however, have not established a sufficiently strong link between Mr. Britton's prior fifteen appraisals and the Property, other than the fact that they were for multi-family property, to demonstrate that Mr. Britton would have been inclined to use the DCF method, and should have used the DCF method, in this instance given prior practice.

This Court finds Mr. Britton's reasoning to be sound under the circumstances. The issue here is nothing more than a difference of professional judgment between the two appraisers. In order to compare like items, this Court will compare the analysis of both appraisers using the direct capitalization method since Mr. Britton did not perform a DCF analysis. Using this method, Mr. Harvey concluded value of $14,700,000 and Mr. Britton concluded a value of $13,300,000.

## C. *Mr. Britton's $2,000,000 Deduction*

The single most important issue facing this Court is the propriety of Mr. Britton's $2,000,000 deduction for "deferred maintenance" from his concluded value under the income approach. The appraisal treatise by the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (9th Edition 1987) (the "Ninth Edition"), cited by both parties as the controlling authority on modern appraisal valuation methods and practice, does not specifically make mention of the lump sum deduction for "deferred maintenance" under the income capitalization approach. Mention of "deferred maintenance" in the Ninth Edition appears in the chapter on the cost approach of valuation of property. Ninth Edition at 380, 383, 403. It would seem that a deduction for "deferred maintenance" is properly taken only in a cost approach analysis. In the same vein, the Secured Creditors' argument that deferred maintenance can only be cured when the cost of such curative measures can be recouped (the "Feasibility Analysis"), relates solely to deductions from new construction costs to determine value under the *cost approach* of valuation. Ninth Edition at 353. Accordingly, the Secured Creditors' Feasibility Analysis will not be addressed by this Court when evaluating the income approach to valuation.

However, the characterization of the $2,000,000 deduction as "deferred maintenance" may be misleading in light of the stated purpose of that deduction. The Debtor claims that the $2,000,000 deduction represents remedial expenditures that a

reasonable purchaser and/or financing institution would take into account in the purchase price and/or the financing to be obtained. Accordingly, the Debtor posits that the $2,000,000 deduction was properly made at the conclusion of the income capitalization approach pursuant to modern appraisal techniques.

The Secured Creditors attack the $2,000,000 deduction as being duplicative and contrary to the purpose and proper application of the income capitalization approach.

Under the income capitalization method, included in the items to be deducted from operating income should be an expense item for "Maintenance and Repair" which covers items such as "roof repair, window caulking, tuckpointing, exterior painting, and the repair of heating, lighting and plumbing equipment." Ninth Edition at 449. Capital expenditures clearly do not fall within this category and should not be included as an expense item in the analysis. *Id.* Another expense item is the "Replacement Allowance" which "provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced periodically during the building's economic life." *Id.* at 450. Included in this category are: roof covering; carpeting; kitchen, laundry equipment; compressors, elevators, and boilers, specific structural items; and equipment that have limited economic life expectancies; interior improvements to tenant space that are made periodically by the landlord, usually at lease renewal; sidewalks; driveways; parking areas; exterior painting. *Id.*

■ Both appraisers make provision for maintenance and repair, although the amount allocated by each appraiser for this item differs. The Debtor claims that the Harvey Update did not take into account the quality and condition of the Property. According to the Debtor, its $2,000,000 deduction does exactly that. The Debtor claims that the $2,000,000 must be deducted from the value of the Property because the repairs must be made in order for the Property to achieve market rate rents. However, both appraisers did project rental income based on the current condition of the Property, not improved condition. Both appraisers found that the current rental rates for the Property at market rate. *See* 2nd RERC Appraisal at 52; Harvey Update at 88. Indeed Wudske testified that the rents of the Property had been decreasing due to the condition of the Property. Tr. 4/26/91 at 184–188. Therefore, the additional $2,000,000 deduction is not necessary since it is accounted for in the rents used by the appraisers to calculate operating income.

■ Mr. Britton utilized a higher vacancy rate (8%) than did Mr. Harvey (5%). The Secured Creditors claim that if the Mr. Britton correctly made a $2,000,000 deduction for improvements to be made within the projected 12 month period, then he should have used a vacancy rate that reflects the improved condition of the Property. The Debtor states that the vacancy rate used by Mr. Britton "is based in the current state of facts and his projections as to the vacancy rate at the Property for the ensuing 12 months; the period during which he directly capitalized the Property's projected income." Debtor's Reply Memorandum at 20–21. This Court rejects the Debtor's reasoning. The $2,000,000 reflects substantial immediate improvements of the Property which, presumably, are necessary in order to make the Property more desirable. If that is achieved, the logical expectation is that the vacancy rate should be less than what it would be had the improvements not been made. Mr. Britton should not have based the vacancy rate on the current condition of the Property if the $2,000,000 dollars in improvements were to be made. However, Mr. Britton's 8% vacancy rate seems appropriate if the $2,000,000 deduction is not made because in that event the current condition of the property should be accounted for.

The Debtor in turn attacks the 5% vacancy rate used by Mr. Harvey as overly optimistic given the condition of the Property and the fact that the Mr. Harvey does not provide for major renovation of the Property in the near future. It stands to reason that if the Property is currently in fair

condition, and, if only normal maintenance and repair is performed without making the significant necessary expenditures, the vacancy rate will increase as the Property ages. Mr. Harvey recognizes that the Property is in need of significant improvements but concludes that in light of the economic environment, such improvements should be postponed until it is economically sound to make them. Harvey Update at 39. Since 1990, despite Grady's services, the vacancy rate has steadily increased and rental rate have been reduced in an attempt to increase occupancy at the Property. Exh. 13. As of May 31, 1991, the conclusion of the Trial, the vacancy rate was 10%. Certainly, Mr. Harvey's 5% vacancy rate is too low under these circumstances.

■ The overall capitalization rate (the "OAR") applied by Mr. Britton to the operating income is inflated in light of the $2,000,000 deduction. The OAR is the capitalization rate applied to the subject's net operating income to derive the income capitalization value for the Property. The OAR is derived by examining data from sales comparables. An appraiser chooses an OAR for the subject property by comparing the subject property to the sales comparables and making a judgment regarding what the proper OAR is for the subject property based on such comparison. Ninth Edition at 473.

Both appraisers computed OARS for actual sales comparables. The range for Mr. Britton's comparables is 7.1% to 8.2%. The range for Mr. Harvey's comparables is very similar at 7.3% to 8.1%. The capitalization rate utilized by Mr. Britton is 8.5% while Mr. Harvey utilized a rate of 8%. The Secured Creditors attack Mr. Britton's choice of an 8.5% capitalization rate as unreasonably high in light of the range of Mr. Britton's comparables. The Debtor however, claims that use of comparables is misleading because the real estate boom of the nineteen-eighties resulted in deflated OARs in comparison to those applicable during the current real estate recession. Indeed, the sale of one Harvey comparable did in fact occur during the height of the real estate boom. The Debtor concludes that Mr. Harvey should have used an OAR for the Property which was much higher than the highest comparable to take account of the current recession.

Appraisal analysis is not an exact science. While there are standards and guidelines that must be followed, in many instances decisions and choices made by an appraiser are truly guided by his/her judgment. It is not surprising, therefore, that the appraisers in the case, *sub judice*, differ as to the proper capitalization rate to apply. However, what cannot be justified is the use of an admittedly high capitalization rate, which results in a lower derived value, and then making a $2,000,000 deduction from that already deflated value. Therefore, if the Debtor wishes to rely on the 8.5% OAR used by Mr. Britton, the $2,000,000 is improper.

Moreover, this Court finds Mr. Harvey's 8% OAR more appropriate. Mr. Britton used the 8.5% figure, .4% higher than his highest comparable, because he claims that it is necessary in light of the current recession. However, this number seems arbitrary. This Court cannot help but wonder why the OAR was not 8.6% or 8.2 for that matter; both those numbers are higher than Mr. Britton's highest comparable. By contrast, Mr. Harvey stayed within the range of his comparables, but went to the high side of the scale. Obviously both appraisers feel that the OAR for the Property should be on the high side. But Mr. Harvey managed to stay within his range which seems to be in line with modern appraisal practice.

D. *Mr. Britton's Adoption of the $2,000,-000 Figure*

This Court is extremely concerned by Mr. Britton's unqualified reliance on the $2,000,000 figure without as much as an itemized list of what that figure represents. The Grady Analysis, proposes a 5 year renovation plan; the majority of the work to occur in the first year. There are two alternative plans set forth in the Grady Analysis. The first is a complete renovation estimated to cost approximately 4.9

million dollars. Tr. 4/26/91 at 215; Exh. 3–A and 3–B. The second is a scaled down renovation estimated to cost 3.9 million dollars. Tr. 4/26/91 at 218; Exh. 3–A and 3–B. Mr. Britton's reliance on the Grady Analysis in preparing his reconstructed operating statement is reasonable and to be expected; however, Mr. Britton should be able to explain to what extent he relied on the Grady Analysis. Mr. Britton testified that the $2,000,000 figure was based upon the funds available for repair according to Douglas Nemens of Brookhill Management Corp., the Debtor's primary managing agent. Tr. 5/20/91 at 103–104. It is impossible to determine which of the expenditure items in the Grady Analysis are included in the $2,000,000. To the extent that the $2,000,000 includes replacements to occur within the 12 month projected period, those cost items should be included in the replacement allowance estimate. To the extent that part of the $2,000,000 includes repair and maintenance expenditures, those costs should be included in the repair and maintenance estimate. Finally, to the extent the $2,000,000 includes capital expenditures, those items are not included as an expense item.

Mr. Britton's blind reliance on the $2,000,000 figure is too great a leap of faith for this Court to make.

### E. *Mr. Britton's Use of a Reserve for Replacement*

■ According to Mr. Britton, a reserve for replacement, a $44,230 item, should be included among the items to be deducted from potential gross income in calculating net operating income. 2nd RERC Appraisal. Mr. Harvey does not make a provision for such an item, nor should he have. According to the Ninth Edition, an "appraiser should attempt to reflect market practice in the use of replacement allowances." Ninth Edition at 451. Even Mr. Britton acknowledges that replacement allowances are "not necessarily a component of typical operating statements in the area." 2nd RERC Appraisal at 69. Therefore, Mr. Harvey was fully justified in not creating a replacement reserve in his reconstructed operating statement. By following market practice,

Mr. Harvey was able to properly compare the Property with like comparables. The use of a replacement allowances and the capitalization rate are inversely related. *See* Ninth Edition at 451. Therefore, where a replacement reserve is used in the reconstructed operating statement of a subject property, it is misleading to compare it to comparables which do not include a replacement allowance in their operating statements.

Moreover, the fact that Mr. Harvey did not create a replacement allowance does not mean that he failed to take into account the poor condition of the Property. While Mr. Harvey certainly does not recommend a full blown renovation project, he did account for the condition of the Property in his repair and maintenance estimate, a $225,000 item, which is well in excess of Mr. Britton's repair and maintenance estimate, a $166,000 item. Even if Mr. Britton's replacement allowance estimate were added to his repair and maintenance estimate, Mr. Harvey still provided for almost $15,000 more in aggregate maintenance and repair expenses for the Property than did Mr. Britton. Mr. Harvey certainly took into account the deteriorated condition of the Property when preparing his reconstructed operating statement.

### F. *The Remaining Allegations by Both Debtor and Secured Creditors*

The Secured Creditors point to other alleged errors in the 2nd RERC Appraisal with respect to the cost approach and the sales comparison approach. The purpose of those attacks is to completely discredit the 2nd RERC Appraisal. However, as noted at the beginning of this opinion, both appraisers agree that the income capitalization approach is the best method for valuation of the Property. Errors in the other approaches do not necessarily translate into errors in the income capitalization approach and therefore will not be considered. In the same vein, any alleged errors by Harvey in conducting the cost and sales comparison approaches will not be considered.

■ Finally, this Court will not consider the Federal National Mortgage Association ("FNMA") lending guidelines because they are irrelevant. Both appraisers valued the Property as of it were free and clear of all debt, thus, the terms upon which any debt financing is available are irrelevant.

## CONCLUSION

This Court finds that except for the vacancy rate used, the analysis in the Harvey Update using the direct capitalization method is correct and controlling. The more appropriate vacancy rate that should have been used in the Harvey Update is 8% which takes into account the current condition of the Property.

The Secured Creditors are directed to settle an order consistent with this decision on five days notice.