**In re John G. BROUMAS and Ruth D. Broumas, Debtors.**

**James P. KOCH, Plaintiff,**

v.

**L. Lawton ROGERS, III, and Rogers & Killeen, Defendants.**

**Bankruptcy No. 91–40752–pm.**
**Adversary No. 93–23–pm.**
**Civil No. PJM 95–2429.**

United States District Court, D. Maryland.

Dec. 20, 1996.

L. Lawton Rogers, III, Rogers & Killeen, Alexandria, VA, pro se.

James P. Koch, Trustee, Baltimore, MD.

## OPINION

MESSITTE, District Judge.

### I.

This is an appeal from a decision of the Bankruptcy Court in a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H). The Debtors are John G. and Ruth D. Broumas. Their Trustee, James P. Koch, has sought to avoid and recover allegedly preferential and/or fraudulent transfers Debtors made to Defendants L. Lawton Rogers, III, Esquire and the Law Firm of Rogers and Killeen. The Bankruptcy Court voided certain of the transfers but not others. The Trustee and Defendants have filed cross-appeals from the Bankruptcy Court's decision.

### II.

▆ Findings of fact made by the Bankruptcy Court in core proceedings are reviewed under the clearly erroneous standard. Bankruptcy Rule 8013. *Green v. Staples (In re Green),* 934 F.2d 568, 570 (4th Cir.1991) citing *Stenersen Corp. v. Giuffrida (In re Stenersen Corp.),* 61 B.R. 702, 705 (D.Md. 1986). Conclusions of law are reviewed *de novo. Green,* 934 F.2d at 570, citing *Stenersen,* 61 B.R. at 705.

### III.

A) Except as noted, the Court holds that the Bankruptcy Court's findings of fact are not clearly erroneous and accepts them as controlling.

B) The Bankruptcy Court found as follows:

Debtors John G. and Ruth D. Broumas filed for relief under Chapter 7 of the Bankruptcy Reform Act of 1978 on February 15, 1991. Prior to filing, John Broumas (hereafter referred to as "Broumas") was Chairman of the Board of Madison National Bank, now defunct. Individual Defendant Lawton Rogers was a member of Defendant Rogers and Killeen, a Virginia law firm specializing in intellectual property. Broumas and Rogers were acquaintances through Rogers' dealings as a customer of Madison National. Their acquaintance developed into a business relationship lasting over 15 years.

During that time Rogers and his law firm maintained bank accounts at Madison. In the course of their relationship, Rogers allowed Broumas unlimited access to his Madison accounts as well as the account of Rogers and Killeen. Broumas had signature authority over the accounts and would see to it that money was available in the accounts to cover various drafts because, as Rogers testified, "there were many occasions when it was necessary for me to have some banking done when I was not physically present and able to do it."

Over the years Broumas and Rogers made loans to each other and pledged each other's credit. Broumas was free to take money from Defendants' accounts so long as funds were available to them when needed. Broumas also used Defendants' accounts to effectuate sales of stock in James Madison Ltd., the holding company for Madison National Bank. Indeed, Broumas and Rogers were eventually investigated by the Securities and Exchange Commission (SEC) in order to determine whether they were involved in a "wash trade" scheme to artificially inflate the price of the stock by creating the appearance that it was being heavily traded.[1] The SEC ultimately enjoined Broumas from future purchases or sales of stock in which there was no change of beneficial ownership. He was also prohibited from working for a financial institution insured by the FDIC. Although no charges were brought against Rogers, he admitted that, at Broumas' request, he had in fact placed orders to buy and sell James Madison, Ltd. stock.

In addition to the foregoing, Broumas and Rogers entered into various investments to-

---

1. Wash trades are illegal under federal securities law because they create the false impression of active trading in a public stock. *See* 15 U.S.C. § 78i(a)(1); 15 U.S.C. § 78j(b). While the Bankruptcy Court did not find the transactions illegal, declaring that "that issue [was] not before this Court," it did observe that there were "red flags" to alert Defendants the actions were illegal.

gether over the years. Rogers testified, for example, that the two became involved in Gemstone Venture, a partnership formed to develop a refrigeration device, as well as in a transaction for the purchase of land in Ocala, Florida. The Florida transaction comprises part of the instant litigation and will be discussed in further detail presently.

On a number of occasions and in a number of matters Rogers and his firm acted as Broumas' attorney. One such matter involved a breach of contract and unjust enrichment case Broumas filed in Maryland state court late in 1989 against two individuals with whom Broumas had invested in the Tantallon Country Club. The Tantallon litigation settled in May, 1990, after Rogers and his firm filed a motion for preliminary injunction to prevent the sale of the property. The net result of Rogers' representation of Broumas in the litigation was that Broumas gained an additional $10,000 from the eventual sale of the property.

In another transaction in July, 1990, Rogers, in his capacity as attorney, wrote to Madison National Bank warning that, with respect to certain indebtedness Broumas had to the bank, Broumas was in a desperate financial situation and would, if the bank would not cooperate in a refinancing arrangement for him, be forced to file for bankruptcy under Chapter 7. Rogers informed Madison that Broumas was insolvent and that his debts exceeded his assets by over $2 million. Other legal services rendered by Rogers for Broumas included registration of a trademark, the drafting of a Rule 144 letter, and representation of Broumas in a transaction known as the Montgomery Lane Joint Venture.[2]

In the year prior to the filing of this case, ostensibly on account of debts that had accrued at an earlier time, Broumas transferred several assets to Defendants. The Trustee has sued to have these transfers set aside.

## IV.

A) 1) The first transactions challenged by the Trustee involve Broumas' transfer to Rogers and Killeen of third and fourth deeds of trust on Broumas' residence in Chevy Chase, Maryland. The firm recorded the third deed of trust in July, 1990, purportedly to secure payment of a $50,000 flat fee it claimed for representing Broumas in the Tantallon litigation and on the same day recorded the fourth deed of trust, purportedly to secure repayment of a $25,000 loan the firm had made to Broumas out of its account at Madison National Bank. Both transfers occurred within the year prior to the filing of Debtors' Chapter 7 filing.

2) The next challenged transaction involves Broumas' transfer to Rogers of his interest in certain real property located in Ocala, Florida. The property consisted of three parcels, two of which Broumas owned outright (having been declared owner in a quiet title proceeding in which he was represented by Rogers) and the third on which he held a $45,000 first mortgage. On August 14, 1990, Broumas transferred to Rogers the deed to the two parcels he owned outright, admittedly without consideration. The third parcel, encumbered by the Broumas mortgage, became the subject of a forfeiture proceeding. Rogers obtained title when, at his request, the U.S. Marshal for the Middle District of Florida executed a quitclaim deed in his favor. Apart from the existence of Broumas' interest as mortgagee, no consideration appears to have been involved. The quitclaim deed was executed on September 14, 1990. On November 19, 1990, Rogers sold the 3 assembled parcels to third party purchasers for the sum of $115,000. Shortly thereafter he advised Broumas by letter that "all three parcels, four trailers, and the other improvements" had been sold.

3) Finally, the Trustee seeks to set aside a series of cash transfers between Broumas and Defendants that occurred between Feb-

---

**2.** After the filing of the petition herein, Rogers' relationship with Broumas took on a new facet— that of landlord and tenant. Thus at a post-petition foreclosure sale Rogers purchased the Broumas' Chevy Chase, Maryland, home. Broumas and his wife have continued to reside in the home for which, apparently with the help of relatives, they pay Rogers rent of $3,500 per month. This yields Rogers a small positive cash flow after the payment of the mortgage and taxes.

ruary and May 1990. These transactions were part of the "wash trade" scheme that became the subject of the SEC investigation. Bank accounts of Broumas and Rogers were used to effectuate the sale and purchase of James Madison Ltd. stock. The Trustee alleges that the net result of these transactions was a shortfall in Broumas' account and a net gain in those of Rogers and/or the Rogers firm. The Trustee seeks to recover Defendants' purported net gain from these transactions.

The Trustee contends that each of the foregoing transfers was "preferential" within the meaning of 11 U.S.C. § 547(b) and "fraudulent" within the meaning of 11 U.S.C. § 548.

B) Following trial, the Bankruptcy Court found that:

1) The transfer of the third deed of trust on the Chevy Chase property was not preferential but was constructively fraudulent;

2) The transfer of the fourth deed of trust on the Chevy Chase property was neither preferential nor fraudulent;

3) The Ocala, Florida, land transfer was both preferential and constructively fraudulent; and

4) The cash transfers were neither preferential nor fraudulent.

The Court awarded the Trustee $50,000 representing the value of the third deed of trust on the Chevy Chase property and $115,000 representing the value of the Ocala property.

The Trustee appeals the Bankruptcy Court's decision that the third deed of trust on Chevy Chase was not preferential; Defendants appeal the finding that it was constructively fraudulent.

The Trustee appeals the decision that the fourth deed of trust on Chevy Chase was not preferential (but not the finding that it was not fraudulent).

Defendant Rogers appeals the decision that the Ocala land transfer was preferential and constructively fraudulent.

The Trustee appeals the decision that the cash transfers were not fraudulent (but not the decision that they were not preferential).

The Court affirms the Bankruptcy Court in all but a limited respect. It reverses that Court's finding that the transfers of the third and fourth deeds of trust on the Chevy Chase property were not preferential and accordingly reverses the Bankruptcy Court's dismissal of Count I of the First Amended Complaint and awards judgment in the Trustee's favor on that Count in the amount of $75,000, the aggregate value of both the third and fourth deeds of trust. In otherwise affirming the Bankruptcy Court, the Court will also enter judgment in the Trustee's favor on Count III (and alternatively on Count IV) in the sum of $115,000, the value of the Ocala land transfer.

### V.

A) 11 U.S.C. § 547 dealing with preferences, provides in pertinent part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer has not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 548, dealing with fraudulent transfers and obligations, provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

Both § 547 and 548 require that the trustee prove the debtor was insolvent at the time the transfers were made. Here the Bankruptcy Court found that the Trustee had shown by a preponderance of the evidence that Debtors were insolvent as of July 1990 and neither party has appealed that finding.

■■■■ B) The Bankruptcy Court also found that Rogers was an "insider" within the meaning of the preference section, § 547(b)(4)(B), such that transfers occurring up to one year prior to filing would be covered. As Chief Judge Mannes noted, the definition section of "insider" in 11 U.S.C. § 101(31) is nonexhaustive. *In re Gilbert,* 104 B.R. 206, 209 (Bankr.W.D.Mo.1989); *Zakroff v. Markson (In re Ribcke),* 64 B.R. 663 (Bankr.D.Md.1986). The legislative history of the statute indicates that an "insider" is a person or entity with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S.Rep. No. 95–989, 95th Cong. 2nd Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5810. Contrary to Defendants' contention, actual control is not a predicate to finding someone to be an extra-statutory insider. Insider status, as Chief Judge Mannes stated, is determined by factual inquiry into the debtor's relationship with the alleged insider. *See Browning Interests v. Allison (In re Holloway),* 955 F.2d 1008, 1011 (5th Cir.1992); *Sticka v. Anderson (In re Anderson),* 165 B.R. 482, 487 (Bankr. D.Or.1994); *Rush v. Riddle (In re Standard Stores, Inc.),* 124 B.R. 318 (Bankr.C.D.Cal. 1991); *Cimino v. The Writer Corp. (In re Polk),* 125 B.R. 293 (Bankr.D.Colo.1991); *Huizar v. Bank of Robstown (In re Huizar),* 71 B.R. 826, 831 (Bankr.W.D.Texas 1987).

The evidence in this case amply demonstrates the "long term complex relationship" between Debtors and Defendants that led the Bankruptcy Court to find Defendants were "insiders". The parties' relationship has been variously that of creditor and debtor, principal and agent, joint venturers, attorney and client, and landlord and tenant. Broumas and Rogers made numerous loans to each other not evidenced by written promises to pay; Rogers permitted Broumas to make withdrawals from his bank account as if it were his own; the two were involved in investment deals without written agreements; Rogers agreed to represent Broumas in litigation without a written fee agreement; and the two made numerous purchases of bank stock in furtherance of a questionable "wash trade" scheme that was the subject of the SEC enforcement action. On this record, the Bankruptcy Court's determination that Rogers was an insider was not clearly erroneous.

C) The third and fourth deeds of trust

1) As Preferences

The Bankruptcy Court found and the parties do not dispute that, relative to the third and fourth deeds of trusts, three other conditions of § 547 were met. The transfers were made to a creditor, § 547(b)(1); they were made on account of antecedent debt, § 547(b)(2); and they were made within one year before the date of the filing of the Petition, § 547(b)(4)(B).

The Bankruptcy Court found, however, that the Trustee had failed to demonstrate, as required by § 547(b)(5)(B), that Defen-

dants received more than they would have if the transfer not been made. The Court cited *Smith v. Creative Financial Management, Inc. (In re Virginia–Carolina Financial Corp.)*, 954 F.2d 193, 199 (4th Cir.1992) for the proposition that the trustee must demonstrate that the transfers enabled a defendant to receive more than he would have "had the creditor waited for the liquidation and distribution of the estate." The Bankruptcy Court reasoned that, since Debtors' home eventually sold at foreclosure for an amount less than the aggregate balances due on the third and fourth deeds of trust, "[D]efendants received no more as a result of the transfer than they would have received had they waited until the property was liquidated."[3]

This Court agrees with the Trustee that the Bankruptcy Court erred in its assessment and application of the law.

■ Beginning with *Virginia–Carolina Corp.* as did the Bankruptcy Court, in analyzing the § 547(b)(5) issue, the initial focus is "upon whether the creditor would have received less than a 100% payout in a Chapter 7 liquidation," 954 F.2d at 193. As the Supreme Court stated in *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936), this is measured "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined by when bankruptcy results."[4] In effect, "the court must construct a hypothetical liquidation of the debtor's estate to determine whether the creditor recouped more as a result of the alleged preferential payment than he would have received at the time of the bankruptcy (as opposed to the time of transfer) under a Chapter 7 liquidation had the payments not been made." *Merrill v. Abbott (In re Inde-*

*pendent Clearing House Co.)*, 77 B.R. 843 (C.D.Utah 1987).

It is indisputably clear that a 100% distribution to creditors was impossible in this case. Reviewing the Debtors' schedule of assets and liabilities, *see e.g. Flatau v. Tribble's Shoes, Inc. (In the Matter of David E. Lawrence)*, 82 B.R. 157 (Bankr.M.D.Ga.1988), this was a "no asset" filing in which substantially all scheduled assets totalling well less than $2 million were subject to liens or security interests. General creditor claims, on the other hand, approximated $5.0 million.

■ But the next focus under § 547(b)(5) is not upon the value that the transferred property might eventually have to the creditor, here the diminished value of two deeds of trust at the time they were coincidentally bought by the transferee himself approximately one year after the bankruptcy filing. Instead, the focus is upon the value of the property given by the debtor at the time of the transfer. *See* 11 U.S.C. § 550. *See Drewes v. FM Da–Sota Elevator Co. et al. (In re Da–Sota Elevator Co.)*, 939 F.2d 654 (8th Cir.1991); *Pritchard v. Brown (In re Brown)*, 118 B.R. 57 (Bankr.N.D.Tex.1990). That value, moreover, is fair market value. *See, e.g., Reiber v. Baker (In re Baker)*, 17 B.R. 392 (Bankr.W.D.N.Y.1982); 4 *Lawrence P. King et al., Collier on Bankruptcy* ¶ 550.02, n. 6b (15th ed. 1966).[5]

■ The Bankruptcy Court found that the third and fourth deeds of trust were granted at a time when there was equity in the property, indeed when competent expert testimony established the fair market value of Debtors' residence to be $640,000.00 and the aggregate value of the first and second deeds of trust to be $544,000.00.[6] The net equity of $96,000.00 as of that time was more than sufficient to cover a third trust of $50,-

---

**3.** Notably, Defendant Rogers was the purchaser at the foreclosure sale, but the Bankruptcy Court held that the fact that he was a lienholder "did not put him at any advantage."

**4.** Section 547(b)(5) incorporates the rule of *Palmer Clay Products*. *See Virginia–Carolina Corp.*, 954 F.2d at 199.

**5.** Fair market value, it has been observed, is rarely reflected by the price property sells for at

foreclosure. *See U.S. v. 5,139.5 Acres of Land in Aiken and Barnwell Counties, S.C.*, 200 F.2d 659 (4th Cir.1952); *Accord Waring v. Guy*, 248 Md. 544, 237 A.2d 763 (1968).

**6.** Defendants' arguments that the Bankruptcy Court erred in calculating the equity in Debtors' residence are addressed in Part V:C:2 hereof.

000.00 and a fourth trust of $25,000.00. Defendants received $75,000.00 in value as of then regardless of what might have come later. To that extent they received value before the hypothetical Chapter 7 liquidation and also shared (more appropriately, suffered) with general creditors a less than 100% distribution in the hypothetical liquidation. Defendants, in other words, obtained a preference.

The Court holds that the Bankruptcy Court's ruling that the third and fourth deeds of trust on the Chevy Chase property were not preferential was erroneous as a matter of both law and fact.

Accordingly, the Court will reverse the Bankruptcy Court's dismissal of Count I of the First Amended Complaint and will enter judgment in the Trustee's favor on that Count in the amount of $75,000.00, the aggregate value of the third and fourth deeds of trust as of the date of the preferential transfers.

2) As Fraudulent

The Bankruptcy Court did not find that Debtors, in transferring the third and fourth deeds of trust, possessed actual intent to hinder, delay or defraud creditors within the meaning of 11 U.S.C. § 548(a)(1) and neither party has appealed that determination.

The Court did find, however, that the Trustee proved constructive fraud with regard to the third deed of trust in that Debtors received less than reasonably equivalent value in exchange for the transfer, as defined by § 548(a)(2)(A). The Court therefore held the Trustee was entitled to recover the full value of the third deed of trust, i.e. $50,-000.00. As to the fourth deed of trust, the Court held that the Trustee had not met his burden of proving less than reasonably

equivalent value, hence judgment was rendered in favor of Defendants.

Defendants ask this Court to reject the Bankruptcy Court's finding of constructive fraud as to the third deed of trust.

The Court declines to do so.

The Bankruptcy Court properly recognized that "reasonably equivalent value" looks to the consideration actually received by the debtor, not to the value given by the transferee. *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir.1992). "Value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2)(A). The Court made unassailable findings of fact regarding the value of the property transferred and the value of the property received. *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir.1993), *cert. denied* 510 U.S. 821, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993).

Thus the third deed of trust on the Chevy Chase property, with a face value of $50,-000.00, was supposedly given to secure payment of legal fees Broumas owed Defendants for representation in the Tantallon Country Club litigation. But the Bankruptcy Court found that there was no written fee arrangement regarding the $50,000.00 flat fee, no novel issues were involved in the case, Defendants were not required to attend any hearings, and the net result of settlement of the claim was an additional $10,000.00 to Broumas.[7] In addition, the Bankruptcy Court expressed serious doubts about the credibility of Defendants' "self-serving testimony" regarding time spent on the matter. The record unquestionably supports the Court's factual conclusion that Defendants' legal services were not worth $50,000.00.[8]

---

7. Defendants challenge the Bankruptcy Court's finding that Broumas only received a $10,000 settlement from the Tantallon litigation, claiming instead that he gained $64,000. But in a letter sent to opposing counsel in that litigation on December 14, 1989, Rogers acknowledged that the Tantallon defendants admitted a $65,000 liability to Broumas, this before Rogers agreed to handle the case for the flat $50,000 fee. Rogers can thus claim no credit for the $64,000 (or, more precisely, the $65,000) payment.

8. In what appears to be a last-gasp effort to establish the value of their fee, Defendants suggest that, over and above the services in the Tantallon litigation, Broumas received the promise of prospective legal services from Rogers and his firm. Apart from the fact that the law does not consider the promise of unperformed legal services as value, *see Wootton v. Ravkind (In re Dixon)*, 143 B.R. 671 (Bankr.N.D.Texas 1992), Defendants cite no record evidence of the value of such unperformed services.

The record also supports the Court's finding that the value of the third trust was the full $50,000.00. Again, expert testimony established that the value of Debtors' home was $640,000.00. Since the aggregate value of the first and second deeds of trust was $544,000.00, the Court could fairly conclude that the $50,000.00 third deed of trust was fully secured at the time it was recorded. Defendants argue that the Bankruptcy Court should have used the actual foreclosure price ($596,000.00) as the value of property and should have subtracted the actual costs of sale ($13,342.00) and prior liens ($544,000.00) to arrive at a value for the third deed of trust of $28,658.00. But the Court is unpersuaded.

■ As already discussed, the relevant base date for valuation of a challenged transfer is the date of transfer, the appropriate measure is fair market value. The price a property might bring at a foreclosure sale a year post-petition has little relevance. Defendants' reliance on *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) cuts no ice. BFP was a proceeding to avoid the mortgage foreclosure sale itself on the theory that the price received at the sale was less than the reasonably equivalent value of the property as of the time of the foreclosure. The Supreme Court held that, so long as all requirements of the state's foreclosure laws have been complied with, the price actually received at the foreclosure sale is reasonably equivalent value. Here the Bankruptcy Court properly determined the fair market value of the property as of the date the third deed of trust was recorded. It would have committed clear error if, as Defendants urge, it had relied on the price the property brought at a foreclosure approximately one year after bankruptcy.

■ Defendants also contend that in computing the value of the third deed of trust, the Bankruptcy Court erred in not deducting the expected cost of sale of the property. They cite *In re Smith*, 92 B.R. 287, 290 (Bankr.S.D.Ohio 1988) for the proposition that a 10% hypothetical cost of sale deduction would be appropriate. This is a

highly doubtful conceit. In the first place where, as here, the evidence suggests that the debtor intends to retain the secured property,[9] consideration of a hypothetical cost of sale is inappropriate. *See Coker v. Sovran Equity Mortgage Corp. (In re Coker)*, 973 F.2d 258 (4th Cir.1992). Even assuming without deciding that a cost of sale deduction is proper, it is not otherwise self-evident that a 10% hypothetical cost should apply. At least one court has held that only the actual cost of disposition can be deducted from the value of the property, not an assumed amount. *See In re Vienna Park Properties*, 132 B.R. 517 (Bankr.S.D.N.Y. 1991). In the present case, the only evidence of actual cost of sale in connection with the foreclosure is the amount contained in the auditor's report, $13,342.41, just over .2% of $640,000.00. This is a far cry from 10% of fair market value or $64,000.00. In the face of such evidence, the Court finds no reason to assume a hypothetical cost of sale in an amount that would multiply actual cost several times over. Supposing, for example, a more realistic 4% of fair market value for the expected cost of sale ($16,000.00), since the net equity of the property before deduction of the $16,000.00 was $96,000.00, reducing that amount by $16,000 would result in a net equity of $80,000.00, an amount still in excess of the aggregate face value of the third and fourth deeds of trust.

■ Finally, the Bankruptcy Court recognized that Defendants would be entitled to credit for the actual value of the legal services they rendered in exchange for the third deed of trust if they took "in good faith" within the meaning of 11 U.S.C. § 548(c). The Court, however, went on to observe that a transferee does not take in good faith if at the time of the transfer he has knowledge or notice that the debtor is insolvent, citing *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 861–63 (C.D.Utah 1987). The Bankruptcy Court accurately cited the law and evidence to establish Defendants' actual knowledge of Debtors' insolvency as of the date of the transfer. Rogers' July, 1990, letter to Madison National Bank, in which he proclaimed Broumas to

---

9. See fn. 2, *supra*.

be on the verge of bankruptcy, much as Rogers would like to disavow it now, in and of itself supports the Bankruptcy Court's conclusion. There was and is no basis to credit Defendants with any value for services rendered.

All the elements of constructive fraud with respect to the third deed of trust are fully supported by the record. The Court affirms the finding of the Bankruptcy Court that the third deed of trust was constructively fraudulent. Judgment alternative to Count I will be entered on Count II of the First Amended Complaint in favor of the Trustee in the sum of $50,000.00.

## VI.

A) The next transaction Defendants challenge concerns the real estate in Ocala, Florida. The Bankruptcy Court found this transfer both preferential within the meaning of 11 U.S.C. § 547(b) and constructively fraudulent within the meaning of 11 U.S.C. § 548(a)(2).

B) 1) In General

Defendants begin by arguing that the parcel of the Ocala property represented by the quitclaim deed dated September 14, 1990 was not before the Bankruptcy Court, only the first two parcels were. As the Trustee points out, however, his First Amended Complaint at Paragraph 11 unequivocally alleges the preferential and/or fraudulent transfer of all three parcels.

Defendants also say that Broumas never held a beneficial interest in the two parcels that he transferred to them, that he was no more than a bare legal titleholder. Again ample record evidence supports the Bankruptcy Court's holding that Broumas was the owner of the property. Not least is the fact that the Circuit Court for Marion County, Florida, on October 31, 1989, specifically declared Broumas the owner of the two parcels.

Defendants next say Broumas only transferred two parcels, not three; that the third parcel came from the U.S. Marshal, not from Broumas. But the only holder of an identifi-

able interest in the third parcel was Broumas as mortgagee. Rogers, inferrably as assignee of Broumas' interest in the mortgage, succeeded to the title to that property by means of a no-consideration quitclaim deed.[10] The quitclaim deed, moreover, merged and confirmed conveyance of all 3 parcels. The Bankruptcy Court could fairly conclude that Broumas in effect transferred all three parcels to Rogers.

Defendants next contend that the Bankruptcy Court should have reduced the $115,000 Rogers obtained when he sold the property by the value of personal property allegedly not included with the sale. To the contrary, Rogers' letter to Broumas shortly following the sale clearly implies that the sales price covered the land and all property upon it. There is no evidence, moreover, to suggest that the personal property transferred along with the land had any separate or valuable consideration apart from the consideration assigned to the land.

2) As a Preference

Defendants' only remaining challenge to the Bankruptcy Court's conclusion that they were preferred in respect to the Ocala land transfer goes to the Court's finding that Defendants were insiders. The Court has already discussed this issue in detail. Again, the record evidence in support of the Bankruptcy Court's finding of such status is abundant.

3) As Fraudulent

The Bankruptcy Court found the Ocala land transfer constructively fraudulent in that it was made at a time when the Debtors were insolvent and Defendants had actual knowledge of that fact, with the result that Defendants earn no credit for value actually given under § 547(c). The Court has already discussed Defendants' "good faith" argument and rejected it in connection with the third and fourth deeds of trust on the Chevy Chase property. The Bankruptcy Court could reasonably find that Rogers had actual knowledge of Broumas' insolvency, thereby

10. The Bankruptcy Court found as a matter of fact that, contrary to his claim, Rogers had neither paid the original purchase price for the third parcel nor arranged for Broumas to hold the property for him in trust. These findings are fully supported by the record.

forfeiting any entitlement he may have had to expenditures.

## VII.

 The last transactions the Trustee seeks to avoid are a series of cash transfers slightly in excess of $98,000.00 that Broumas made to Defendants between February and May 1990. The Bankruptcy Court found that this cash was transferred in furtherance of the "wash trade" scheme by which Broumas and Defendants, without changing Broumas' beneficial ownership, attempted to create the false impression of heavy trading in James Madison, Ltd. stock. The Bankruptcy Court found neither actual nor constructive fraud in these transfers. The Trustee appeals only the Bankruptcy Court's finding with respect to constructive fraud.

The Trustee argues that the Bankruptcy Court's conclusion that he failed to establish that Broumas received less than reasonably equivalent value within the meaning of 11 U.S.C. § 548(a)(2)(A) was erroneous as a matter of law, citing a number of cases to the effect that a transfer is not for reasonably equivalent value when the transferee lacks good faith. Good faith, says the Trustee, is lacking when a transferee, with culpable knowledge, participates in the debtor's fraud and illegality. But in virtually all the cases Trustee cites the transferee ended up with an asset of value. *See e.g. Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589 (9th Cir.1991); *Jobin v. McKay (In re M & L Business Machine Co., Inc.)*, 164 B.R. 657 (D.Colo.1994). Here, however unsavory Rogers' participation in the stock scheme may seem, the net effect was that in very short order an identical amount of cash traveled back to Broumas. There was no diminution of the Debtors' estate.[11]

In holding Defendants' good or bad faith immaterial, the Bankruptcy Court correctly stated the law. *Harman v. First Bank of Maryland (In re Jeffrey Bigelow Design*

*Group, Inc.)*, 956 F.2d 479 (4th Cir.1992), sets the standard:

> For the constructive fraudulent transfer count to succeed, the trustee must show that the debtor received less than reasonably equivalent value in exchange for its payments and that the debtor was insolvent at the time. 11 U.S.C. § 548(a)(2) (1988). Because it is uncontested that the debtor was insolvent during the period one year prior to the bankruptcy, the issue is whether reasonably equivalent value was given in exchange for the payments. In explaining the phrase "reasonably equivalent value," one commentator has stated:
>
>> Reasonably equivalent value is not susceptible to simple formulation.... The focus is on the consideration received by the debtor, not on the value given by the transferee. The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors. Consequently, what constitutes reasonably equivalent value must be determined from the standpoint of the debtor's creditors....
>
> Jack F. Williams, "Revisiting the Proper Limits of Fraudulent Transfer Law," 8 Bankr.Dev.J. 55,80 (1991) (footnotes omitted) (emphasis added). Hence the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

956 F.2d at 484.

Unsecured creditors in this case suffered no adverse consequence from the otherwise dubious stock transactions between Broumas and Defendants. In refusing to avoid the cash transfers, the Bankruptcy Court committed no error of law or fact.

---

11. The Trustee argues that the aggregate transfers into the Defendants' bank and brokerage accounts exceeded transfers to Debtors out of those accounts. But the Bankruptcy Court found "problems" with the Trustee's exhibit regarding these accounts and could not conclude as a matter of fact that the net result of the transfers was to the detriment of Debtors. The Court's factual finding in respect of the net cashflow was not clearly erroneous.

VIII.

Summing up, the Court will reverse the Bankruptcy Court's findings of no preference with regard to the transfer of the third and fourth deeds of trust on the Chevy Chase property, will reverse dismissal of Count I of the First Amended Complaint and will enter judgment in favor of the Trustee in the amount of $75,000, the value of the two deeds of trust, on that Count. All other findings of fact and orders of judgment proposed by the Bankruptcy Court will be affirmed.

A separate Order implementing this Opinion will be entered.