In re MODEL IMPERIAL,
INC., et al., Debtors.

Development Specialists, Inc., an Illinois corporation, as Liquidating Trustee of the Model Imperial Liquidating Trust, Plaintiff,

v.

Hamilton Bank, N.A., Defendant.

Bankruptcy Nos. 96–32922–BKC–PGH, 96–32929–BKC–PGH.
Adversary No. 98–3007–BKC–PGH–A.

United States Bankruptcy Court,
S.D. Florida.

May 16, 2000.

Charles Throckmorton, Esq., Kozyak Tropin & Throckmorton, P.A., Miami.

John Genovese, Esq., David Cimo, Esq., Genovese, Lichtman, Joblove & Battista, Miami.

### MEMORANDUM DECISION AND OR- DER ON CORRECTED AMENDED OBJECTION OF LIQUIDATING TRUSTEE OF THE MODEL IMPE- RIAL LIQUIDATING TRUST TO ALLOWANCE OF CLAIM OF HAM- ILTON BANK AND AMENDED COUNTERCLAIM

PAUL HYMAN, Jr., Bankruptcy Judge.

### Procedural History

On January 13, 1998, plaintiff Developments Specialists, Inc. ("DSI") filed its Objection of Liquidating Trustee of The Model Imperial Liquidating Trust to Allowance of Claim of Hamilton Bank and its Counterclaim to the proof of claim filed in this case by defendant Hamilton Bank, N.A. ("Hamilton"). DSI subsequently filed a Corrected Amended Objection to Claim and Counterclaim (the "Complaint"), to which Hamilton filed an answer. The pleadings were superseded by this Court's Pretrial Order in Connection with November 9, 1999 Trial on Core Claims (the "Pretrial Order"), in which the Court adopted certain legal and factual stipulations by the parties. The trial of the above-captioned Adversary Proceeding commenced before the Court on November 5, 1999.

### Summary of Issues Presented at Trial

The issues, as framed and tried by the parties,[1] are summarized as follows: DSI

---

1. DSI's Corrected Amended Objection to Claim and Counterclaim contained ten

counts. By order dated May 28, 1999, the District Court held that Counts VI through X

contends that the Debtor, Model Imperial, Inc. ("Model"), made various transfers to Hamilton with actual intent to hinder, delay and defraud creditors and that such transfers are therefore avoidable and recoverable pursuant to 11 U.S.C. §§ 548(a)(1) and 550. Hamilton denies DSI's allegations and asserts that, to the extent it received any avoidable transfers, Hamilton is protected from liability under 11 U.S.C. §§ 548(c) and 550(b) because it received the transfers in good faith, for value, and without knowledge of the voidability of the transfers.

DSI also asserts that Hamilton received certain post-petition transfers from Model that are avoidable under 11 U.S.C. § 549 and, finally, that any allowed claim that Hamilton holds in Model's bankruptcy case should be equitably subordinated pursuant to 11 U.S.C. § 510(c). Hamilton disputes these claims.

The Court, having considered the evidence presented, the demeanor and candor of the witnesses, and the arguments of counsel, hereby enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, as made applicable hereto by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### FINDINGS OF FACT

DSI, an Illinois corporation, is the Liquidating Trustee of the Model Imperial Liquidating Trust (the "Liquidating Trust"). Both prior to and during the Model Chapter 11 bankruptcy proceedings, DSI acted as a consultant to the Bank Group (as defined below) and performed services on behalf of the Bank Group with regard to Model. The Liquidating Trust was created under, and to implement the terms of, the confirmed plan of reorganization (the "Confirmed Plan") in Model's substantively consolidated Chapter 11 bankruptcy cases pending in the United States Bankruptcy Court, Southern District of Florida, Case Numbers 96–32922–BKC–PGH through 96–32929–BKC–PGH.

According to the terms of the Confirmed Plan, the causes of action set forth in the Complaint, including the Core Claims, were transferred to the Liquidating Trust.

Hamilton is a national banking association authorized to do business and doing business in Florida. Hamilton has extensive experience in financing goods acquired abroad through the use of letters of credit financing secured by warehouse receipts. Such a financing arrangement affords a means by which the goods acquired through the financing of Hamilton also serve as the collateral for the loan because the goods are deposited in a bonded warehouse and released only with the written authorization of Hamilton.

Harold M. Ickovics ("Ickovics") was the President and Chief Executive Officer of Model, and Ilene Goldman ("Goldman") was Model's Executive Vice President of Sales and Marketing. Stephen Kesh ("Kesh") joined Model in 1993 as the Chief Operating Officer and subsequently became the Chief Financial Officer of Model. Until the end of 1993, Model's sole business consisted of the wholesale distribution of brand name fragrances in the United States. In 1993 Model experienced growth and expansion when it entered the business of direct retailing of products, distribution of complementary product lines, and acquisition of brand name product lines and exclusive distribution rights.

---

were "Core Claims" pursuant to 28 U.S.C. § 157(b) and that the remaining counts were non-core. *Development Specialists, Inc. v. Hamilton Bank, N.A.*, Case No. 98–8660–CIV–Hurley. By order dated July 9, 1999, the Court severed the trial of the Core Claims and the Non–Core Claims. The Findings of Fact and Conclusions of Law contained herein dispose of, and relate only to, the Core Claims.

The Core Claims that were tried were Count VII (equitable subordination), Count VIII (fraudulent transfer), and Count X (post-petition transfer). Prior to the pretrial conference, DSI withdrew Count VI (usury) and Count IX (preference).

Ickovics also owned Jennico Trading Corp. ("Jennico"). Jennico had been incorporated as a Florida corporation in or about 1990 and was represented by the law firm of Greenberg Traurig. Keith James ("James"), a lawyer with Greenberg Traurig, testified that he, or his paralegal under his instruction, prepared Jennico's corporate seal and corporate resolutions. The evidence established that Jennico was inactive prior to 1995.

Between 1991 and 1994, Model's reported sales and net income, along with its purported inventory and accounts receivables levels, increased as reflected below:

| | 1991 (in $) | 1992 (in $) | 1993 (in $) | 1994 (in $) |
| --- | --- | --- | --- | --- |
| Net Sales | 65,233,403 | 101,867,894 | 130,005,557 | 160,504,622 |
| Net Income | 1,091,254 | 2,562,793 | 5,061,141 | 4,894,814 |
| Accounts Receivable | 11,975,439 | 13,901,792 | 18,186,021 | 26,853,972 |
| Inventory | 15,656,531 | 22,609,723 | 38,312,487 | 62,624,479 |

In April of 1994, Model effected a 25,000–for–one stock split resulting in five million shares being held by Ickovics. In June of 1994, Model issued a prospectus in connection with its public offering for two million shares of Model's common stock. Model raised $16 million from the public offering, of which it obtained net proceeds of $6.2 million. As a result of this public offering, Ickovics caused Model to distribute $8.2 million to himself.

In order to finance existing operations, Model utilized a revolving credit facility (the "Revolving Credit Facility") with various banks (collectively the "Bank Group"). Borrowings under the Revolving Credit Facility were based upon a predetermined percentage of Model's inventory and accounts receivable and were secured by all of Model's assets. The Revolving Credit Facility was increased and extended from $12 million in 1990 to $65 million [2] by the end of 1995, at which time the participating lenders in the Bank Group were NationsBank, BankBoston, and South Trust. The Bank Group periodically extended and increased the Revolving Credit Facility.

James represented Model during its negotiations with the Bank Group. James testified that he was involved in the initial documentation of the loan between the Bank Group and Model; that he was involved in several of the amendments to the loan documentation; and that he was "fairly intimately" familiar with the terms of the loan documentation.

On November 17, 1994, the Bank Group executed an Amended and Restated Loan and Security Agreement (the "Loan Agreement") with Model. Pursuant to the Loan Agreement, NationsBank acted as the lead participant and agent for the other participating banks. Under the Revolving Credit Facility, Model was allowed to borrow up to 85% of its total "Eligible Receivables" (as that term is defined in the Loan Agreement) and up to 55% of its total "Eligible Inventory" (as that term is defined in the Loan Agreement). Pursuant to the Loan Agreement, the duration of eligibility for a particular receivable was dependent upon its terms.

The Loan Agreement imposed restrictions on Model's ability to borrow money from other lenders. Section 10.2 of Model's Loan Agreement with the Bank Group provided that Model could not directly or indirectly "[c]reate, assume, or otherwise become or remain obligated in respect of, or permit or suffer to exist or to be created, assumed or incurred or to be outstanding any Indebtedness for Money Borrowed." Section 10.3 of the Loan Agreement provided that Model could not directly or indirectly "[b]ecome or remain liable with respect to any Guaranty of any obligation of any other Person." Section 10.9 provided that Model could not "[c]reate, assume or permit or suffer to exist or to be created or assumed any lien on any of the property or assets of [Model and its affiliates]."

The Court heard extensive testimony from Goldman and Len Silverstein ("Silverstein"), Model's controller, concerning

---

2. At the time of the transactions at issue here, the approved line was in the amount of at $55 million. There were conditions precedent to the line increasing to the full $65 million.

Model's operations and financial condition during the time period relevant to this case. Cash flow during the relevant period was always an issue at Model and was generally poor. Goldman testified credibly that in response to its cash flow needs, Model engaged in numerous transactions that had no economic substance, that she personally considered illegal, and that were for the purpose of artificially creating financing availability from the Bank Group. While these transactions did not involve Hamilton, they are probative of Model's specific actual fraudulent intent with respect to the Bank Group and Model's course of fraudulent conduct with respect to its line of credit with the Bank Group.

Model's fraudulent transactions, which were designed to obtain financing improperly from the Bank Group, included the following:

A. *Tuesday Morning:* Model transacted over $1 million of business with one customer, Tuesday Morning, on a consignment basis but reported the transaction to the Bank Group as a sale. Model received financing from the Bank Group, despite the fact that the receivables from consignment transactions were ineligible for financing under the Loan Agreement. Model never advised the Bank Group that the Tuesday Morning transactions were on consignment.

B. *Joe Rares/Fragrance Plus of Texas:* On one occasion when Model needed cash from the Bank Group, Model booked a sale of miniature bottled fragrances, or "minis," to Fragrance Plus of Texas, a company owned by Joe Rares, for $2.67 million. The transaction was undertaken with the express understanding that the goods would be returned to Model. The minis were delivered to Fragrance Plus of Texas

wrapped in black shrinkwrap and were returned several months later still in the original shrinkwrap. Silverstein testified that the minis were returned to the Hamilton bonded warehouse and that Hamilton financed the return of the minis.[3] Although Model booked a profit on the transaction. Fragrance Plus of Texas never paid for the goods, and Model did not earn a profit on the transaction. Indeed, Fragrance Plus of Texas charged Model for the storage of the goods that it had supposedly purchased from Model. When Goldman confronted Ickovics about this transaction, he acknowledged that it was "fraud" and "illegal."

C. *Lexdale:* Goldman testified that she was ordered by Ickovics to create a "sale" with Lexdale, a New York company, for the purpose of financing but that she refused. She further testified that Ickovics then arranged the "sale" after calling Lexdale and asking them to do Model "a favor." The "sale" did in fact take place with the express understanding that the goods would eventually be returned to Model.

D. *General Perfumes:* Commencing in 1994, Model began a series of multi-million dollar fraudulent transactions with General Perfumes, which had previously been Model's primary competitor. Model transacted less than $500,000 in "niche" business with General Perfumes in 1993, yet Model booked approximately $1.3 million in sales to General Perfumes and its affiliated company, C & C Beauty Sales ("C & C"), in 1994 and $21 million in 1995. Goldman expressly and repeatedly agreed with Mike Narona ("Narona") of General Perfumes that General Perfumes could return the goods that Model was selling to it. Of the $21 million of goods "sold" to General Perfumes in 1995, approximately $7 million in goods were returned to Model within

---

**3.** The fraudulent nature of this transaction is underscored by the accounting treatment that it received at Model. The initial sale resulted in the booking of a receivable from Fragrance Plus of Texas to Model. When the goods were returned in September of 1995, a pay-

able from *Jennico* to Model was booked, but Jennico was invoiced for the goods by an entity called "Gardenia," which Model's controller described as nothing more than "a name on an invoice."

thirty days. Similarly, in 1994 approximately one-third of the units sold to General Perfumes were returned within thirty days. The principals of General Perfumes and C & C, Narona and Rene Garcia ("Garcia"), repeatedly invoked their Fifth Amendment privileges when questioned about General Perfumes' transactions with Model.[4] The Court infers that any testimony that Garcia or Narona would have given would have implicated them in the fraudulent conduct that Goldman described. Goldman testified that Ickovics and Kesh were aware of these transactions and that Goldman herself considered the transactions to be "illegal" and without a legitimate business purpose.[5] Based on Goldman's undisputed testimony as to the fraudulent purpose of these sales and the negative inference against General Perfumes and its principals, the Court concludes that the transactions between Model, General Perfumes, and C & C were indeed fraudulent and were intended by Model to obtain advances from the Bank Group improperly.

All of these alleged sales were not true sales and were booked solely to create availability under the line of credit with the Bank Group. There was no business purpose to these transactions, and they generated no profit for Model. They were conceived for the exclusive purpose of creating a receivable against which Model could improperly receive an advance from the Bank Group. Model never told the Bank Group of the purpose of any of these transactions.

In the spring of 1995, Model was fully extended on its line of credit with the Bank Group. On April 19, 1995, the Bank Group declined Model's request for additional financing under the credit facility. In declining the request, the Bank Group expressed specific concerns that Model had grown too quickly; that Model was overextended on its debt; and that Model had not formulated and executed a budget or strategic business plan. In May of 1995, Model's cash position was, in Goldman's words, "the poorest it had been since I'd been there, and that's pretty bad." Silverstein characterized Model's cash position at the time as "desperate."

Ickovics and Kesh then approached Hamilton for financing. Because, according to Ickovics and Kesh, Model's agreements with the Bank Group precluded Model from borrowing money or guaranteeing the debt of another company, Ickovics and Kesh suggested that Hamilton establish a lending relationship with Jennico.

When Hamilton first considered Jennico as its borrower in May of 1995, Hamilton knew that Jennico had no assets. Silverstein, Model's controller, testified that Jennico was activated to enable Model to borrow funds from Hamilton because Model had "maxed out" on its credit line with the Bank Group. Jennico had no employees. Prior to May of 1995, Jennico never had any sales and never booked a profit on any transaction. According to the testimony of Silverstein, the Model employee responsible for maintaining Jennico's financial records, Jennico was merely a "paper company." Jennico had no preexisting balance sheet when it was activated for the Hamilton loan. Kesh instructed Silverstein to create a balance sheet for Jennico. Jennico's sole assets according to its initial balance sheet were $10,000 in cash trans-

---

**4.** The Court draws no inferences against Hamilton from Garcia's and Norona's refusal to testify but is permitted to draw a negative inference against non-parties Garcia, Norona, and their company, General Perfumes. *See, e.g., FDIC v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969 (5th Cir.1995).

**5.** The Court notes that even Hamilton's designated fraud expert, Lawrence Plave, expressed the belief that Model had engaged in deceptive business practices, including "circular transactions, buying and selling non-arm length transactions and the sales and purchases of inventory of perfumes, swapping of checks, the fictitious or false reporting of information to the SEC, to the auditors, to the Bank Group, to Hamilton Bank, things like that."

ferred from another Ickovics' company, Imperial Cosmetics, and "equity capital" of $100,000. The $10,000 was subsequently repaid, and the "equity capital" was nothing more than a "loan receivable" from Ickovics that was never documented and never paid.

Jennico had never participated in a single fragrance transaction prior to 1995, and Goldman testified that she had never even heard of Jennico prior to the Hamilton transaction in April of 1995. Goldman's only activities on behalf Jennico were to cross out Model's name on Model purchase orders; to insert Jennico's name, when so instructed; and to keep a manual record of the Jennico inventory.

As set forth below, Hamilton was aware at all relevant times that Model was subject to borrowing restrictions. In August of 1994, Hamilton considered making a $3.5 million loan directly to Model. In a memorandum dated August 5, 1994 to Hamilton chairman Eduardo Masferrer ("Masferrer") concerning General Perfumes, Juan Carlos Bernace ("Bernace"), Hamilton's Senior Vice President, noted that:

> A $3,500M line of credit facility could be granted to Model Imperial ("MI"), however, the Bank must perfect its security interest in the inventory since MI's primary lender is Nationsbank. This process could be accomplished by providing cash advances strictly on consignment of goods through warehouse receipts and bills of lading. *Notification would be given to Nationsbank.*

(emphasis added). Hamilton knew that the Bank Group might refuse to consent to the proposed loan to Model. In the same memorandum, Bernace emphasized:

> HOWEVER, IT SHOULD BE NOTED THAT NATIONSBANK MAY PRESENTLY PROHIBIT [MODEL IMPERIAL] FROM OBTAINING OTHER FINANCING OR PROVIDING GUARANTEES.

(emphasis in original).

Hamilton did not revisit the issue of lending to Model until late April of 1995. On April 28, 1995, Bernace, who was then head of all domestic lending at Hamilton, wrote a memorandum to Masferrer advising that Model had approached Hamilton about a letter or credit transaction. Bernace stated that he had "received a telephone call from Steve Kesh, C.F.C. of the company referenced above," (i.e., Model, the only company referred to anywhere in the memorandum). Bernace noted that he had contacted Garcia[6] "to inquire on the character of the principals [of Model]," and that "Garcia commented that he would be willing to examine the product which would be provided as collateral in order to assure that the Bank is well secured."

In his April 28, 1995 memorandum to Masferrer, Bernace discussed numerous financial and operational details of Model's business. Bernace testified that at the time he wrote the April 28, 1995 memorandum, Model was Hamilton's prospective customer. Two business days later, on May 2, 1995, Bernace wrote a memorandum to Hamilton's senior loan committee, stating that he had been approached "by the subject" to consider a "special transaction." The "subject" of the memorandum was identified as "Model Imperial, Inc." At trial, Bernace acknowledged that this memorandum related to the same Model transaction as Bernace's April 28, 1995 memorandum.[7] In his May 2, 1995 memorandum, Bernace stated that Hamilton

---

**6.** Throughout 1995, Garcia was a shareholder of Hamilton's parent company, Hamilton Bancorp, and (through his companies) was a customer of Hamilton. General Perfumes had a $12 million revolving credit facility with Hamilton and its loan participants.

**7.** Despite this acknowledgment by Bernace, the author of the documents, Juan Aguerrebere ("Aguerrebere"), one of Hamilton's banking experts, testified that he saw no connection or relationship between the two memoranda. For this and other reasons discussed *infra*, the Court gives little or no weight to Aguerrebere's expert opinions.

would have to make the loan to a "non-active corporation" named Jennico because "the current credit facility from Nationsbank does not allow Model Imperial, Inc. to guarantee or incur debt with another Bank." [8] The decision to use Jennico was the result of a discussion between Bernace and Kesh in which, in Bernace's words, they "discussed the structure [i.e., the Bank Group's loan restrictions against Model] and how we would feel comfortable in *getting around it.*" (emphasis added).

In his May 2, 1995 memorandum, Bernace also stated that "[s]ince Jennico Trading Corp. is a non-active corporation, the analysis of this transaction will focus on the Bank's take-out." He then set forth a detailed analysis of Model's background, Model's industry overview, Model's distribution operations, Model's sources of supply, Model's management, Model's stock information, and Model's financial analysis. Bernace's presentation of the transaction to the senior loan committee included no analysis of any Jennico financial statements. Bernace testified that Model's inability to incur additional debt was the only reason that Jennico was used as Hamilton's borrower.

The "special transaction" was approved, and Hamilton issued letters of credit that were used to purchase gift sets that Model needed for the Christmas season. At no time during this process did Hamilton ever contact the Bank Group.

After approving the first "special transaction" for the $1.8 million letter of credit, Hamilton shortly thereafter increased the loans that it was making to Jennico. In a May 19, 1995 memorandum to File–Call Report, Bernace described a lunch he had with Kesh, whom he identified as "CFO, of the companies referenced above." The companies referenced in the memorandum were "Model Imperial/Jennico Trading." There was no evidence that Kesh had any formal position with Jennico. Bernace

noted that Hamilton had already approved a "special transaction" for $1.8 million. Bernace also stated that the "subject" had requested the $1.8 million loan "for the purchase of gift items to market with the fragrances."

According to Bernace's May 19, 1995 memorandum, the purpose of his lunch meeting with Kesh was "to consider a line of credit of $4MM on a revolving basis." Bernace then described the substance of the lunch conversation he had with Model's CFO. According to the memorandum, Kesh began the meeting with "a brief background on the company." The "company" to which they were both reforring was Model, not Jennico, because Kesh indicated, and Bernace wrote that:

(i) the company "has its origin in New York and relocated to Florida in the mid-eighties;"

(ii) the company "operates retail operations;"

(iii) the company's "primary lender provides an asset based landing line of credit;" and

(iv) the asset based line of credit does not provide for advances against inventory in retail outlets, thus resulting in "excess inventory stock" and the need for additional funds.

The final paragraph of Bernace's May 19, 1995 memorandum stated:

Kesh suggested that a meeting with the principal of Model Imperial and the Chairman of the Bank would be in the best interest of both companies prior to establishing a revolving credit facility.

Bernace subsequently arranged a meeting between Ickovics, Model's principal, and Masferrer.

Less than a month later, on June 12, 1995, Maria Jose Bojorge ("Bojorge"), a senior Hamilton loan officer, wrote a memorandum to the senior loan committee at

---

**8.** The exhibits and testimony discusses herein contain frequent references to Model's relationship with NationsBank. It is undisputed that this is shorthand for Model's relationship with the Bank Group, for whom NationsBank acted as agent.

Hamilton. In her June 12, 1995 memorandum, Bojorge stated that the purpose of the memorandum was "to request a line of credit in the amount of $4MM in the name of *JENNICO TRADING, INC.* for the opening of sight and term letters of credit and refinancing up to 120 days." (emphasis in original). Bojorge further stated that "approval of the aforementioned line of credit in the amount of $4MM is recommended based on the cash collateral required ... the good financial condition of Model Imperial, and good reputation of Mr. Ickovics and the company." Bojorge noted that "[w]e are granting this facility in the name of Jennico Trading Corp. since the facility of Model Imperial, Inc. with Nationsbank does not allow them to guarantee or incur debt with another Bank." Bojorge also testified that her understanding of the purpose of the $4 million line was to enable Model to obtain more merchandise and that she understood Model "indirectly" to be Hamilton's borrower.

On June 12, 1995, Hamilton prepared a "Basic Information Report" in connection with the proposed $4 million line of credit to Jennico. The "Basic Information Report" identified the "Borrower" as "Jennico Trading Corp./Model Imperial, Inc." Like Bernace's May 2, 1995 memorandum in connection with the initial financing, this report contained a detailed analysis of Model's business and finances and identified Model as Hamilton's "takeout."

At the request of Ickovics and Kesh, Hamilton ultimately extended a $4 million line of credit to Jennico (the "Jennico Loan"). Pursuant to this financing arrangement, Jennico acquired fragrances financed by Hamilton. The fragrances so acquired secured the Jennico Loan and were placed in a bonded warehouse, Daher–Golden Eagle. The warehouse released the goods only upon the written authorization of Hamilton. In connection with the Jennico Loan, Hamilton filed a UCC–1 Financing Statement, naming Jennico as the debtor and Hamilton as the secured party.

Although the Jennico inventory was kept in a separate warehouse, Model had access to the inventory and was free to obtain Jennico inventory by paying Jennico for it or replacing it with substitute inventory, subject to Hamilton's approval. The Jennico inventory was never transferred to anyone other than Model, who paid Jennico the same price that Jennico paid to its suppliers. Hamilton also agreed to permit Jennico to substitute inventory from Model that was not in immediate demand for other inventory for which Jennico had informed Hamilton that Model had a ready customer and a purchase order to fill. Model's controller, Silverstein, testified that the Jennico Loan was "an additional collateral loan" for Model because of Model's ability to swap inventory in and out of the "Jennico warehouse" freely. In Silverstein's words, Jennico itself was an "additional credit line, which gave Model, in effect, the ability to get more inventory." Model's assistant controller, Faith Coverdale, testified that it was initially contemplated that Jennico would only be used for a short time but that its duration became much longer because "Model didn't have cash" and that Model's need for cash was the only reason for Jennico's continued activity.

Hamilton's loan agreement with Jennico required, as a condition of the Jennico Loan, a signed letter (the "Commitment Letter") from Model to Hamilton stating:

> This is to certify that Model Imperial will irrevocably agree to purchase all inventory of Jennico Trading Corp. financed by Hamilton Bank, N.A. on or before the maturity date of the credits extended by Hamilton Bank, N.A. to Jennico Trading Corp. All proceeds from the sale of the inventory, as per attached invoices, will be paid directly to Hamilton Bank, N.A.

During the course of the Hamilton/Jennico relationship, Model delivered several Commitment Letters to Hamilton in connection with particular transactions financed by Hamilton, although Hamilton never at-

tempted to enforce the Commitment Letters against Model or otherwise to seek performance of their terms.

Detailed Greenberg Traurig billing invoices reflect that James and Howard Bregman ("Bregman"), Model's attorneys, had discussions with Kesh regarding Jennico and its proposed lending relationship with Hamilton, although neither attorney could recall the content of those conversations or whether those conversations concerned the Commitment Letters. James prepared the necessary corporate resolutions to enable Jennico to enter into the loan agreement with Hamilton. James testified that he did not have an independent recollection of any conversations with Model as to whether the proposed credit facility with Hamilton violated the Loan Agreement. He further testified that he never gave Model or anyone else an opinion as to Model's involvement in the transaction with Hamilton. Bregman testified that he made assumptions with regard to whether the Hamilton lending relationship were appropriate based on Kesh informing Bregman that he felt that "at best it was... on the line." Neither attorney testified that he advised Model that the proposed loan from Hamilton to Jennico violated the terms of the Bank Group Loan Agreement.

Goldman testified that in the beginning, no one was supposed to know about Jennico except Goldman, Kesh, and Ickovics, and that Jennico transactions were recorded "off the books." Neither Model nor Hamilton advised the Bank Group of Model's dealings with Hamilton (i) when Model first approached Hamilton for a loan in April of 1995 or (ii) when Model obtained a $5 million increase in its line of credit from the Bank Group in July of 1995. As Silverstein, who apparently also had knowledge of the Jennico transactions, testified:

> [I]t wasn't kept a secret, but we were all semi-intelligent people and we always [sic] [9] didn't run over and tell [the Bank Group] about it. So in fairness no one

said keep it a secret, but we were all intelligent enough to know that we weren't going to tell the bank about Jennico unless they asked. Again, if they asked directly, I wouldn't lie, but it wasn't offered.

In a field examination reported dated September 5, 1995, examiners obtained information that Jennico was a supplier of Model; that Jennico goods were insured as part of Model's insurance coverage; and that Hamilton was listed as the "loss payee" with respect to the goods stored in the Jennico warehouse. Robert Walker, a member of senior management at NationsBank, testified that he reviewed the field examination report dated September 5, 1995 when NationsBank received it.

On or about October 18, 1995, in connection with the return of $2.67 million of goods from Fragrance Plus, representatives of Model informed the Bank Group that Jennico was purchasing the goods from Model and that Hamilton was financing the transaction. The $2.67 million received by Model from the sale of the goods to Jennico was applied by Model to reduce its debt to the Bank Group. The Bank Group accepted the money from Model knowing that the money Jennico used to pay Model had come from Hamilton. However, there is no evidence that Model disclosed the critical facts that (i) Jennico had borrowed $4 million from Hamilton, in direct response to Model's inability, in April of 1995, to obtain additional financing from the Bank Group; (ii) Jennico was a shell entity; (iii) Model had given Hamilton a direct, irrevocable commitment to purchase all goods financed by Hamilton; and (iv) Model was the primary source of repayment for the Jennico Loan.

By January of 1996, however, the Bank Group knew all of the relevant facts related to the Jennico Loan. From January of 1996 through March of 1996, Model received $3.1 million in goods from Jennico, which had been financed through Hamil-

---

9. Probably "also."

ton. This inventory acquired by Model from Jennico, with the knowledge of the Bank Group, came during the first part of the year when Model was selling inventory, downsizing Model and reducing the Bank Group's debt by $10 million.

On January 26, 1996, Model announced that it expected to report a net loss for 1995 of between $7.5 and $8.5 million. By April 2, 1996, Model announced that the 1995 net loss was in excess of $20 million.

In or about February of 1996, the Bank Group sent Model a letter notifying Model that it was in default of several provisions of its Loan Agreement with the Bank Group. The Jennico relationship with Hamilton was not mentioned in that letter. On April 6, 1996, the Bank Group entered into a forbearance agreement with Model which included Jennico as a party to the agreement. The Model/Bank Group forbearance agreement contains a recitation of defaults identified by the Bank Group; the Jennico Loan is not mentioned as a default. The Bank Group never notified Model, Hamilton, or Jennico that the Jennico Loan was a purported event of default under the Bank Group Loan Agreement, even though the Bank Group was required to do so under the Loan Agreement before it could assert that the Jennico Loan was an event of default. The Model/Bank Group forbearance agreement required that Hamilton enter into a forbearance agreement with Jennico.

On May 8, 1996, Jennico and Hamilton entered into a forbearance agreement. The Jennico/Hamilton forbearance agreement specifically provided that Hamilton would take possession of the Jennico collateral in the bonded warehouse and liquidate that collateral to reduce the debt owed Hamilton if Jennico failed to cure the indebtedness of the Jennico Loan by August 31, 1996. The Jennico/Hamilton forbearance agreement stated that the purpose of the forbearance agreement was "to give Jennico and Model a further opportunity to make diligent efforts to repay the Loans." Pursuant to the Jennico/Hamilton forbearance agreement, the forbearance would no longer be in effect, if Hamilton so chose, upon the following conditions or events:

(i) Model or Jennico files with any Bankruptcy Court of competent jurisdiction or is the subject of any petition under titles 11 or 7 of the U.S.Code, as amended ("Bankruptcy Code"); or

(ii) Model or Jennico files or is the subject of any petition seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal or state act or law relating to bankruptcy insolvency, or other relief for debtors; or

(iii) Model or Jennico seeks, consents to or acquiesces in the appointment or any trustee, receiver, conservator, or liquidator; or

(iv) Declaration of a Forbearance Default as defined in the April 9, 1996, Reaffirmation and Forbearance Agreement between Model and its Lenders, and commencement of legal proceedings by Model's Lenders.

The Bank Group reviewed a copy of the Jennico/Hamilton forbearance agreement contemporaneously with its execution.

On July 18, 1996, Model filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. After Model filed bankruptcy, Hamilton liquidated and sold the Jennico inventory over a period of time to third parties and received $1,268,152.90. Neither Model nor DSI ever made demand on Hamilton to return the Jennico inventory prior to time when Hamilton liquidated the inventory.

Morris Hollander ("Hollander"), a certified public accountant engaged by DSI to conduct an insolvency analysis of Model, testified that Model was insolvent as of May 1, 1995 based on adjustments he made to Model's balance sheet. The Court finds that the evidence presented, including the testimony by Hollander, established that Model was insolvent and was

not paying its normal and ordinary debts as they came due during the one-year period prior to its bankruptcy.

Jennico had only two sources of cash that it used to repay Hamilton or Jennico's vendors: advances it received from Hamilton and funds received from Model.

When Jennico made a request to Hamilton for funds to pay for the purchase of goods from Model or other third-party vendors, Hamilton would make short term loans to Jennico in the form of letters of credit, bankers acceptances, or straightforward loans, which matured between one and four months. As these loans matured, Hamilton would sometimes extend their terms, at the request of Jennico. The extension of terms of the loan took the form of the booking of a new loan in the amount due on the prior obligation. The proceeds of this new loan were simultaneously applied to satisfy the prior advances.[10] The timing of the new loan had nothing to do with vendor/purchaser terms between Jennico and Model but was keyed specifically to the maturity of the Hamilton loans to Jennico.

At other times, when an advance by Hamilton matured and was payable, Model would transfer a sufficient amount into Jennico's account at Hamilton, which would then be debited by Hamilton to pay the advance. Of these transactions, DSI seeks to avoid $11,931,740.24 in checks from Model to Jennico.[11] Often, Hamilton would contemporaneously readvance the money to Jennico, who would contemporaneously repay Model. In other words, Model did not pay Jennico on account for product, as would be the case in a typical vendor/purchaser relationship; instead, the payments to Jennico were keyed to the amounts payable to Hamilton under the Jennico Loan.

Finally, based on Hamilton's belief in the sound financial condition of Model, Hamilton sometimes received trade acceptances executed by Model to Jennico and endorsed by Jennico to Hamilton in lieu of cash in order to release goods to Model. Hamilton filed a proof of claim in Model's bankruptcy case in the amount of $1,981,715.84, based upon the trade drafts executed by Model in favor of Jennico and endorsed by Jennico to Hamilton.

Jennico issued checks to its third-party vendors in the amount of $4,851,087.57,[12] and $3,273,908.05 of those payments to vendors can be directly traced to funds transferred from Model.[13]

10. The total amount of these transactions is $409,768.20.

11. DSI seeks to avoid the following checks from Model to Jennico issued within one year of filing its petition: # 10430 for $20,000; # 10847 for $550,000; # 11287 for $360,000; # 11301 for $560,000; # 11325 for $370,500; # 11509 for $359,950; # 11510 for $359,951; # 11512 for $338,188; # 11511 for $423,045; # 12081 for $1,100,000; # 12070 for $25,000; # 12562 for $600,000; # 12747 for $153,506.88; # 12748 for $392,900.89; # 12791 for $120,000; # 12953 for $188,038.08; # 12954 for $134,343; # 12970 for $25,000; # 13158 for $600,000; # 13306 for $25,000; # 13731 for $251,738.47; # 13732 for $36,150; # 13733 for $17,820; # 13734 for $93,862.08; # 13735 for $36,531; # 13709 for $900,000; # 13710 for $1,900,000; # 14002 for $35,000; # 13736 for $37,422; # 14259 for $53,560.80; # 14260 $119,453.04; # 14299 for $546,500; # 14261 for $33,858; # 14511 for $202,000.00; # 14535 for $25,000; and # 13730 $900,000.

12. Jennico issued the following checks to its vendors: # 10168 for $2216; # 1005 for $500,000; # 1004 for $500,000; # 1007 for $2650; # 1006 for $553,559.61; # 1008 for $700; # 1010 for $535,875.62; # 1011 for $350,000; # 1009 for $1480; # 1013 for $350,000; # 1012 for $200,000; # 1016 for $370,342.93; # 1021 for $359,901; # 1018 for $360,000; # 1020 for $323,263.50; # 1019 for $423,045; # 1024 for $1230.88; # 1032 for $1186.44; # 1033 for $3345.27; # 1036 for $150; # 1059 for $6535.24; # 1061 for $2590; and # 1060 for $3016.08.

13. Model transferred a total of $3,321,634 to Jennico (check numbers 10847, 11287, 11301, 11325, 11510, 11509, 11512, and 11511) that was used by Jennico to make payments to Jennico's third-party vendors. Jennico issued the following checks to its third-party vendors in the amount of $3,273,908.05 contemporaneously with Jennico's receipt of the $3,321,634 from Model: # 1010 for $535,875.62; # 1011 for $350,000; # 1009 for

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and Federal Rule of Bankruptcy Procedure 7001 et seq. This is a core proceeding under 28 U.S.C. § 157(b)(2).

### A. Model's Intent to Hinder, Delay or Defraud Creditors

DSI alleges that payments made by Model to Jennico and to Hamilton constitute fraudulent transfers under 11 U.S.C. § 548(a)(1). Section 548(a)(1) states:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became on or before the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

While courts have found that constructive fraud will suffice to support a claim

under § 548(a)(2), *see, e.g., Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1197 n. 1 (11th Cir.1988) (finding that actual intent need not be proven to support a claim under § 548(a)(2)), § 548(a)(1) clearly requires actual intent to defraud creditors. *See Bumgardner v. Ross (In re Ste. Jan–Marie, Inc.),* 151 B.R. 984, 987 (Bankr. S.D.Fla.1993) ("In order to avoid a transfer under § 548(a)(1), actual fraudulent intent must be established by the trustee and must be proved by clear and convincing evidence.") (citations omitted). In *Bumgardner,* the court further stated that "[m]ere suspicion of fraud does not suffice." *Id.*

■ There is some discrepancy among Florida courts as to the standard of proof for the elements of § 548(a)(1). In *Bumgardner,* the court stated that the appropriate standard of proof was clear and convincing evidence. *See id.* However, in *In re American Way Service Corp.,* 229 B.R. 496, 525 (Bankr.S.D.Fla.1999) and in *Kapila v. Plave (In re Paul),* 217 B.R. 336, 337 n. 2 (S.D.Fla.1997), the courts found that the correct standard of proof was a preponderance of the evidence. The court in *American Way* stated that while there is authority in this district to heighten the standard of proof under § 548, under the United States Supreme Court's ruling in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the preponderance of the evidence standard applies to fraudulent conveyance actions. *See American Way,* 229 B.R. at 525. In *American Way,* the court stated that it could "discern no 'particularly important individual interests or rights' of a transferee in a fraudulent transfer action that would justify a heightened standard of proof." *Id.* (citing *Grogan,* 498 U.S. at 286, 111 S.Ct. 654) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that

$1480; # 1013 for $350,000; # 1012 for $200,000; # 1016 for $370,342.93; # 1021

for $359,901; # 1018 for $360,000; # 1020 for $323,263.50; and # 1019 for $423,045.

this standard is applicable in civil actions between private litigants unless 'particularly important individual interests are at stake.' "). Based upon a review of the case law, and since there are no "particularly important individual interests at stake," the Court holds that a preponderance of the evidence is the applicable standard of proof.

 Direct proof of actual fraud is often very difficult to establish. *See, e.g., Dionne v. Keating (In re XYZ Options, Inc.),* 154 F.3d 1262, 1271 (11th Cir.1998). Recognizing that direct evidence of fraud does not always exist, courts also allow fraudulent intent to be proven through circumstantial evidence and the surrounding circumstances of the transactions, including the "badges of fraud." *Id.* at 1271–72. These badges include:

(1) The transfer was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer was disclosed or concealed;

(4) Before the transfer was made the debtor had been sued or threatened with suit;

(5) The transfer was of substantially off the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lien-

or who transferred the assets to an insider of the debtor.

*Id.*

In addition, the first indication that a debtor is experiencing financial difficulties is a delay in paying its normal creditors and vendors as their debts come due. A dishonest debtor, seeing financial trouble on the horizon as reflected in its inability to pay normal and ordinary debts as they come due, may begin to make fraudulent conveyances. Thus, the Court finds that a twelfth badge of fraud to be considered in determining the intent of a debtor is whether the debtor is paying its normal and ordinary debts as they come due when the alleged fraudulent conveyances occur.

 The Eleventh Circuit found that when using the badges of fraud to determine the existence of actual fraudulent intent, courts should consider the totality of the circumstances. Citing *In re Sherman,* 67 F.3d 1348 (8th Cir.1995), the court in *XYZ Options* stated that "[a]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of several can constitute conclusive evidence of an actual intent to defraud.' " *XYZ Options,* 154.F.3d at 1271 n. 17; *see also General Trading Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1498 (11th Cir.1997); *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.),* 956 F.2d 479, 483–84 (4th Cir.1992) ("While each fact does not have to demonstrate actual fraud, the facts taken together must lead to the conclusion that actual fraud existed."); *In re Young,* 235 B.R. 666, 669 (Bankr.M.D.Fla.1999) ("While a single badge of fraud may create a suspicion but not the requisite fraud to set aside a conveyance, several considered together may afford a basis to infer fraud.").

According to the Fourth Circuit, a determination of actual fraudulent intent must include a "subjective evaluation of the debtor's motive." *Harman,* 956 F.2d at 484 (discussing also that "an objective determination has bearing on whether con-

structive fraudulent intent exists, but is not conclusive for actual fraudulent intent"); *see also Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.)*, 168 B.R. 408, 418 (Bankr.D.Ariz.1994) (stating that § 548(a)(1) sets out a subjective test for actual fraudulent intent).

■ The evidence directly establishes that Model, having "maxed out" its credit with the Bank Group and in need of cash, went to Hamilton to obtain additional financing after being denied additional credit by the Bank Group. Model was aware of the prohibition against such financing in its loan covenants but nonetheless set out to circumvent those restrictions with the intent to hinder, delay or defraud the Bank Group. Furthermore, all of the transactions between Model and Hamilton occurred while Model was insolvent, and not paying its normal and ordinary debts as they came due. Goldman's testimony directly and unequivocally established that, during the same time period, Model was engaged in a scheme to defraud its creditors, including the Bank Group, by means of "swap" transactions with Hamilton's customer General Perfumes and related entities and the various other transactions discussed herein.

Furthermore, there was direct evidence of Model's fraudulent state of mind in connection with the Jennico Loan. As previously noted, Silverstein testified that Model's management was "intelligent enough" not to volunteer information about Jennico's true status to the Bank Group. Bregman, who was Model's outside counsel, testified that Kesh, Model's CFO, said that the Jennico transaction was, at best, "on the line" because of the definition of "prohibited transactions" in the Loan Agreement. Similarly, Kesh told Model's assistant controller, Faith Coverdale, that Jennico was not supposed to have borrowed money from Hamilton.

In addition to the direct evidence of fraud, the circumstantial evidence establishes a number of the badges of fraudulent intent:

(1) the transfers were concealed from the Bank Group, both by arranging for Jennico to borrow money from Hamilton and by hiding the records of the Jennico inventory so that it would not appear on Model's books;

(2) the transfers occurred while Model was insolvent;

(3) the transfers occurred after Model had incurred a substantial debt, in that it had recently reached its limit on the Bank Group line of credit and its request for an increase had been denied;

(4) because, as discussed below, Jennico is deemed to be the initial transferee of the transfers, the transfers were to an insider; and

(5) the transfers occurred while Model was not paying its normal and ordinary debts as they came due.

Under *XYZ Options*, this confluence of factors mandates a conclusive presumption of fraudulent intent. Therefore, based upon the substantial and unrebutted evidence, the Court finds that Model formulated and acted upon a specific intent to defraud the Bank Group by entering into transactions with Jennico without notifying the Bank Group. Specifically:

(i) Model intended to, and did, *hinder* the Bank Group by, *inter alia*, concealing material information about its finances and operations that prevented the Bank Group from having the timely and accurate data necessary to monitor its $55 million loan to Model;

(ii) Model intended to, and did, *delay* the Bank Group by, *inter alia*, creating the false impression that it was in compliance with the borrowing restrictions in the Loan Agreement and depriving the Bank Group of the opportunity to make an informed decision on and after May of 1995 whether (i) to refuse additional extensions of credit or (ii) to declare a default based on Model's noncompliance with the borrowing restrictions; and

(iii) Model intended to, and did, *defraud* the Bank Group by, *inter alia,* affirmatively concealing material facts (the true details of Model's relationship with Hamilton and Jennico) for the purpose of inducing reliance by the Bank Group in the form of continued financing.

The foregoing Findings are not intended to be mutually exclusive or all-inclusive; there is obviously considerable overlap of the elements of hindrance, delay, and fraud. The Court concludes that DSI has met its burden of proving that Model acted with the requisite fraudulent intent under 11 U.S.C. § 548(a)(1) by a preponderance of the evidence.

### B. Hamilton's No Harm, No Foul Defense

Hamilton asserts that its loan to Jennico infused additional capital into Model and has not been shown to have rendered Model "more insolvent" than it was in April of 1995. Hamilton in effect argues "no harm, no foul" and asserts that DSI's claim under 11 U.S.C. § 548(a)(1) fails in the absence of quantitative proof of damage to Model's creditors. Hamilton asserts that it lost money on the Jennico Loan and argues that Model benefitted from the credit facility with Hamilton. Hamilton argues that DSI can have no claim under 11 U.S.C. § 548(a)(1) in the absence of conclusive proof of harm to Model or Model's creditors. Stated another way, Hamilton argues (i) that DSI's case under 11 U.S.C. § 548(a)(1) fails for want of proof of diminution of Model's estate and (ii) that a transfer can never be made with fraudulent intent if the debtor receives value for the transfer.

The Court disagrees. Under the plain language of § 548(a)(1), the inquiry is not whether the Bank Group or other creditors were harmed by the Jennico Loan, but whether Model intended to hinder, delay or defraud its creditors when it made transfers to Jennico and to Hamilton. Since the transfers were all manifestly made with the intention of perpetuating Model's ability to borrow money in contravention of its Loan Agreement with the Bank Group, the question is whether Model intended its relationship with Jennico to hinder, delay or defraud the Bank Group. As is indicated above, the Court finds that based on the totality of the circumstances, Model did have such intent.

Prior to May of 1995, Model had experienced rapid growth and had received substantial increases in its credit facility from the Bank Group. One purpose of the negative covenants in the Loan Agreement was to enable the Bank Group to understand fully the financial obligations of its borrower. A complete understanding of Model's debt was also essential in order for other covenants in the Loan Agreement, such as debt/equity ratio and interest coverage, to be meaningful.

Edward Mahoney ("Mahoney") testified as DSI's banking expert. Mahoney had extensive banking experience, including former positions as the Deputy Banking Commissioner for the State of Florida, the former President and CEO of American Savings Bank in Miami, and the former President and CEO of Consolidated Bank, N.A. Mahoney testified that Model harmed the Bank Group when Model secretly borrowed from Hamilton by (i) altering the Bank Group's credit risk without disclosing it; and (ii) distorting the flow of accurate and timely information upon which banks rely in monitoring and administering revolving lines of credit.

In contrast to 11 U.S.C. § 548(a)(2), which does require absence of reasonably equivalent value as an essential element of an avoidable transfer, the plain language of 11 U.S.C. § 548(a)(1) contains no such requirement. It merely requires that the transfer be made with the requisite intent to hinder, delay or defraud creditors.

The complementary Bankruptcy Code sections make it clear that this is the proper statutory construction. First, if diminution of the estate were an essential element of a § 548(a)(1) claim, then

§ 548(a)(2) would be redundant. Second, if an exchange for reasonably equivalent value negated fraudulent intent *per se*, § 548(c) and § 550(b), which create affirmative defenses for receiving a transfer "for value," would be unnecessary. Third, the absence of reasonably equivalent value is only one of the badges of fraud that courts consider in determining whether a transfer were made with fraudulent intent under § 548(a)(1). *See, e.g., In re Spatz,* 222 B.R. 157, 169 (N.D.Ill.1998) (finding that under UFTA, reasonably equivalent value relates to only one of several badges of fraud and is not an absolute defense).

Indeed, the cases Hamilton cites do not support Hamilton's argument.[14] *In re Broumas,* 203 B.R. 385 (D.Md.1996), *rev'd in part,* 135 F.3d 769 (4th Cir.1998), is not a § 548(a)(1) actual fraud case and, accordingly, is inapposite here.[15] The other cases upon which Hamilton relies, *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.),* 956 F.2d 479 (4th Cir.1992) and *Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408 (Bankr. D.Ariz.1994) are simply instances where the plaintiffs failed to present direct evidence of fraud or sufficient evidence of the badges of fraud to draw an inference of fraudulent intent from the circumstantial evidence.

Thus, the giving of value in exchange for the transfers is not dispositive of whether they were made by Model with an intent to hinder, delay or defraud Model's creditors. DSI has established both direct evidence of fraud and the existence of several of the

badges of fraud which allow a conclusive presumption of fraudulent intent from the circumstantial evidence.

For all of the foregoing reasons, the Court finds that Model made the avoidable transfers to Jennico with the purpose of hindering, delaying and defrauding its creditors. Accordingly, transfers by Model to Jennico are avoided under 11 U.S.C. § 548(a)(1). The determination of the amount of these avoidable transfers is discussed below.

### C. Hamilton Is a Subsequent Transferee

■ Under 11 U.S.C. § 550(a), to the extent that a transfer is avoided under § 548, the trustee may recover the value of the property transferred from (i) the initial transferee or the entity for whose benefit the transfer was made or (ii) any immediate or mediate transferee of such initial transferee.

In order to avoid liability for its receipt of fraudulent transfers, Hamilton argues that it was not the initial transferee. Hamilton argues that Jennico was the initial transferee of the transfers and that Hamilton was a subsequent transferee with respect to all but the two $900,000.00 checks from Model.[16]

The Eleventh Circuit, in *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196 (11th Cir.1988), adopted a control test for determining whether a defendant is an initial transferee or a mere conduit. *See id.* at 1199; *see also Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1181–82

---

**14.** Moreover, Hamilton's position is inconsistent with this Court's ruling in *In re Goldberg,* 229 B.R. 877, 884–85 (Bankr.S.D.Fla.1998), in which the Court, under Florida's Uniform Fraudulent Transfer Act, denied avoidance under sections 726.106(1) and 706.105(1)(b), Florida Statutes (1997), because the debtor received reasonably equivalent value but nonetheless avoided the transfer under section 726.105(1)(a), Florida Statutes, because it was made with an actual intent to hinder, delay or defraud the debtor's creditors.

**15.** The court in *Broumas* clearly states: "The Bankruptcy Court did not find that Debtors ... possessed actual intent to hinder, delay or defraud creditors within the meaning of 11 U.S.C. § 548(a)(1) and neither party has appealed that determination." *Id.* at 393.

**16.** As discussed in more detail below, Hamilton argues that because two $900,000 checks (# 13709 and # 13730) from Model to Jennico were at least partially applied to third-party investors' loans, Hamilton was a not a transferee of the two $900,000.00 checks.

(11th Cir.1987). In *Societe Generale*, the Eleventh Circuit found that when determining whether the initial recipient of the transfer were the initial transferee or a mere conduit, courts should look to the degree of control that the initial recipient could exercise over the transferred funds. *See Societe Generale*, 848 F.2d at 1199–1200 (stating that if "the defendants had never actually controlled the funds … it would be inequitable to allow recovery against them"). The Eleventh Circuit found that if a defendant "simply held the property as agent[ ] or conduit[ ] for one of the real parties to the transaction," then courts have refused to allow recovery against that defendant. *Id.*

The court in *Societe Generale* cited several cases in support of its finding that the defendant must exercise sufficient dominion and control over the transferred property in order for that defendant to be the initial transferee of the transferred property. *See, e.g., Metsch v. First Alabama Bank of Mobile (In re Colombian Coffee Co.)*, 75 B.R. 177, 179 (S.D.Fla.1987) (finding that bank was mere conduit where bank had no discretion with respect to deposited funds; bank acquired no beneficial interest in the deposited funds; bank exhibited no bad faith; and bank was obligated to follow the depositor's instructions); *In re Black & Geddes, Inc.*, 59 B.R. 873, 875 (Bankr.S.D.N.Y.1986) (finding that steamship agency was mere conduit where it simply collected payment from the debtor and applied the money to pay the freight to the common carrier and stating that in order to be the initial transferee of the property, the person to be charged with liability must have had a beneficial interest in the property transferred); *In re Fabric Buys of Jericho, Inc.*, 33 B.R. 334, 337 (Bankr.S.D.N.Y. 1983) (holding that law firm was not initial transferee because it had acted as mere conduit of funds placed into firm's escrow account).

In applying the above principles to the Model/Jennico/Hamilton relationship, the Court finds that Jennico was the initial transferee of all of the transfers. When Model transferred money to Jennico, generally, the money was deposited into Jennico's account at Hamilton. Subsequently thereafter, Hamilton would debit Jennico's account to pay off a particular advance. The first time that Hamilton gained control over the transferred funds was upon repayment of the particular advance. Moreover, to the extent that payment to Hamilton may have motivated some of the transfers from Model to Jennico, this does not change the fact that Jennico could have retained the funds and not used them to service the Jennico Loan. There was no evidence that Jennico's use of the funds in its bank account was restricted in any way.

With respect to any checks written by Model to Jennico and endorsed by Jennico to Hamilton, the analysis is the same.[17] The checks were voluntarily endorsed by Jennico, and Jennico could have deposited the checks into its checking account and used the money for another purpose but chose not to do so.

Thus, because Jennico was not restricted in its use of the funds transferred from Model, the Court finds that under the control test set forth by the Eleventh Circuit, Jennico had sufficient dominion and control over the funds transferred from Model and was the initial transferee of those funds. Therefore, Hamilton is the subsequent transferee of any avoidable transfers. With respect to the funds transferred from Model to Jennico that can be directly traced to third-party vendors, the Court finds that Hamilton is not a trans-

---

**17.** The avoided transfers include two checks written by Model to Jennico in the amount of $900,000 each. One check was restrictively endorsed and deposited into Jennico's account at Hamilton; the second check was not restrictively endorsed and was deposited into a "bridge account," or a "clearing account," at Hamilton, which was not owned or controlled by Jennico. Hamilton presented testimony that the two $900,000 checks were used to satisfy third-party investors' loans.

feree of those funds. Therefore, Hamilton is not a transferee of $3,327,908.73 of the transfers from Model to Jennico.

### D. Avoidable Transfers

With respect to the $409,768.20 in funds advanced by Hamilton to Jennico that were issued to repay a prior BA that has come due, the Court finds that these are not avoidable transfers because Model did not transfer any funds to Jennico or to Hamilton to satisfy these BAs. The total amount of the alleged fraudulent transfers from Model to Jennico is $11,931,740.24. As discussed above, $3,273,908.05 of those payments are directly traceable to payments made by Jennico to its third-party vendors. Therefore, the alleged fraudulent transfers from Model to Hamilton amount to $8,657,832.19.

■ As to the remaining transactions, in most instances, when a particular extension of credit (denominated a banker's acceptance or BA) would come due, Model transferred sufficient funds into the Jennico account to permit Hamilton to debit the account and to repay the loan in full. In each of these instances, Hamilton retired the first BA and deemed it closed and paid in full. Hamilton generally would issue contemporaneously a new BA and readvance Jennico the amount due on the original BA, which Jennico would use to repay Model. These transactions usually took one to two days to be completed. The total amount of these transactions was $6,415,684.24.[18] Of this $6,415,684.24, Model was immediately repaid through Jennico a total of $6,209,684.47.[19]

With respect to the $6,209,684.47 in funds that were paid to Hamilton, there was no transfer because Hamilton contemporaneously extended new credit by advancing funds to Jennico under a new BA. The proceeds of the new BA were immediately repaid back to Model through the Jennico account. These transactions simply involved "rollovers" because they were in substance an extension of the existing loan rather than a pay-down of the loan: Hamilton would receive payment on its loan but would immediately readvance the money to Jennico.

■ In In re Top Sport Distributors, Inc., 41 B.R. 235 (Bankr.S.D.Fla.1984), the court refused to permit recovery by a trustee, under § 548, when the net effect of the transactions between the debtor and its insiders was that the loan payments were returned to the debtor's account by the insiders. See id. at 239. The court stated that "the net result of each Defendant having redeposited the loan proceeds back into the Debtor's bank account was that the funds never left the corporation. The transfers were essentially a nullity." Id. Furthermore, bankruptcy courts are courts of equity, and as such, "they possess the power to delve behind the form of the transactions and the relationships to determine the substance." In re United Energy Corp., 944 F.2d 589, 596 (9th Cir. 1991); see also In re Madeline Marie Nursing Homes, 694 F.2d 433, 437 (6th Cir.1982) ("Bankruptcy Courts have exercised these equitable powers ... on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud

---

18. These transfers include the following Model checks: # 12081 for $1,100,000; # 12562 for $600,000; # 12747 for $153,506.88; # 12748 for $392,900.89; # 12791 for $120,-000; # 12954 for $134,343; # 12953 for $188,038.08; # 13731 for $251,738.47; # 13158 for $600,000; # 13732 for $36,150; # 13733 for $17,820; # 13735 for $36,531; # 13734 for $93,862.08; # 13710 for $1,900,-000; # 14134 for $37,422; # 14259 for $53,-560.80; # 14260 for $119,453.04; # 14299 for $546,500; and # 14261 for $33,858.00.

19. Jennico issued the following checks to Model: # 1025 for $1,050,000; # 1028 for $600,000; # 1031 for $546,408; # 1034 for $114,000; # 1035 for $322,381.08; # 1044 for $600,000; # 1053 for $36,150; # 1051 for $251,738.47; # 1054 for $17,820; # 1056 for $36,531; # 1055 for $93,862.08; # 1062 for $1,750,000; # 1056 for $37,422; # 1068 for $53,560.80; # 1067 for $119,453.04; # 1071 for $546,500; # 1069 for $33,858.

*will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.*") (*citing Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (emphasis in original)).

The Court concludes that the net result of the $6,209,684.47 repaid to Model was that the funds never left Model when there was a simultaneous or immediate readvance by Hamilton to Jennico and a simultaneous or immediate readvance by Jennico to Model. Thus, $6,209,684.47 of the $8,657,832.19 in alleged fraudulent transfers are not avoidable because in economic reality, they were a nullity.

DSI also alleges that Hamilton charged Model "astronomical" banking fees and charges in the nature of overdraft charges and interest, NSF charges, use of uncollected funds charges and interest, below minimum balance charges, transactions exceeding limit charges, fax statement charges, monitoring fees, and document preparation charges. Hamilton argues that the banking fees and expenses charged to Jennico were customary and reasonable in the banking industry. Bernace testified that based upon Hamilton's practice of reviewing the fees charged in the banking community for similar services provided by other banks in the community, the bank fees and expenses charged to the Jennico account were customary and reasonable in the industry. Alan Goldberg ("Goldberg"), Hamilton's banking expert, also testified that the bank fees and charges were customary and reasonable. DSI presented no evidence to contradict this testimony. The total amount of the bank fees and expenses charged by Hamilton to Jennico was $120,864.36.

The Court finds that even though the bank charges were customary and reasonable in the industry, the relevant inquiry is whether Model transferred money to Jennico with the requisite fraudulent intent

**20.** This amount includes $11,931,740.24 in checks issued from Model to Jennico minus the $3,273,908.05 directly traceable to Jenni-

under 11 U.S.C. § 548(a)(1) and not whether the fees and expenses were customary and reasonable. Hamilton was the subsequent transferee of $2,448,147.72 [20] of the money Model transferred to Jennico. It is not relevant why Jennico transferred the funds to Hamilton. The Court has already found that the transfers were made with the intent to hinder, delay or defraud creditors under 11 U.S.C. § 548(a)(1). The only issue is whether Hamilton received the funds in good faith pursuant to 11 U.S.C. § 550(b).

Thus, the total amount of transfers avoidable under 11 U.S.C. § 548(a)(1) is $2,448,147.72 subject to Hamilton's defense under 11 U.S.C. § 550(b).

### E. Hamilton's Good Faith Defense

Hamilton, as a subsequent transferee, is liable unless it can prove that it took the transfers "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1).

Hamilton bears the burden of proving its affirmative defense under § 550(b)(1). *See, e.g., In re M & L Business Machine Co.,* 84 F.3d 1330, 1338 (10th Cir.1996); *In re Agricultural Research & Tech. Group,* 916 F.2d 528, 535 (9th Cir. 1990); *In re Nordic Village, Inc.,* 915 F.2d 1049, 1055 (6th Cir.1990), *rev'd on other grounds,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).

Good faith is not defined in the Bankruptcy Code. Accordingly, courts generally evaluate good faith defenses on a case-by-case basis. *See, e.g., In re Sherman,* 67 F.3d 1348, 1355 (8th Cir.1995). To determine whether a transferee acts in good faith for purposes of § 548(c), courts look to what the transferee objectively "knew or should have known," such that a

co's vendors and minus $6,209,684.47 in rollover transactions.

transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer. *Id.; see also M & L Business Machine,* 84 F.3d at 1335–36 (quoting *Collier on Bankruptcy* and stating that "the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment"); *Agricultural Research,* 916 F.2d at 535–36 (stating that "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint").

■ Courts also look at whether the transaction "carries the earmarks of an arms-length bargain." *Sherman,* 67 F.3d at 1355; *see also In re Colonial Realty Co.,* 210 B.R. 921, 923 (Bankr.D.Conn.1997) (finding that good faith requires an arm's length transaction as well as: (i) an honest belief in the propriety of the activities in question; (ii) no intent to take unconscionable advantage of others; and (iii) no intent to or knowledge of the fact that the activities will hinder, delay or defraud others).

■ Fundamental to the concept of good faith is that a transferee may not remain willfully ignorant of facts which would cause it be on notice of a debtor's fraudulent purpose:

> Good faith is to be measured objectively, rather than subjectively. Consequently, a transferee may not put on "blinders" prior to entering into transactions with the debtor and claim the benefit of § 548(c), where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency.

*In re Cannon,* 230 B.R. 546, 592 (Bankr. W.D.Tenn.1999).

A similar analysis of both the nature of the transaction and the transferee's lack of knowledge of facts which would cause a reasonable person to make further investigation is applied in the context of § 550(b)(1) defenses. *See, e.g., In re Southmark Corp.,* 217 B.R. 499, 507 (Bankr.N.D.Tex.1997), *rev'd in part on other grounds,* 242 B.R. 330 (N.D.Tex. 1999); *In re Consolidated Capital Equities Corp.,* 175 B.R. 629, 637–38 (Bankr. N.D.Tex.1994); *In re Richmond Produce Co.,* 151 B.R. 1012, 1021–22 (Bankr. N.D.Cal.1993).

■ The mere failure to make inquiry in the face of unusual circumstances also is sufficient to preclude a good faith defense. *See Cannon,* 230 B.R. at 592 (stating further that "[c]ourts have generally held that it is not necessary to show that the transferee had actual fraudulent, though fraudulent intent on the part of the transferee would clearly establish lack of good faith"); *see also In re M & L Business Machine Co.,* 84 F.3d 1330, 1335–36 (10th Cir.1996).

Thus, under § 550(b)(1), it is Hamilton's burden to prove that this was an ordinary business transaction that bears the hallmarks of an arms-length transaction and that Hamilton was unaware of any facts which would have caused a reasonable person to make further inquiry into the possible fraudulent purpose of the transaction.

■ Applying the foregoing legal standards, the Court concludes that Hamilton did not receive the transfers from Jennico in good faith. The Jennico Loan was not an ordinary business transaction. Hamilton was approached to provide financing to Model, a publicly traded corporation, and then days later, Hamilton agreed to make a loan to Jennico, a non-active "paper company" which had no financial statements and no employees. Hamilton relied exclusively on the credit of Model for repayment but failed to make inquiry with Model's lenders as to its credit history or notify them of its proposed loan.

Hamilton was aware of Model's restrictions from incurring or guaranteeing other debt but undertook no investigation either through inquiry with the Bank Group or an independent review of the documents to determine whether the structure of its transactions violated those restrictions. Whether the Commitment Letters violated the Loan Agreement restrictions against guarantees is not the relevant analysis. The issues are whether Hamilton, based on its knowledge of the restrictions in the Loan Agreement, had an obligation to contact the Bank Group and whether Hamilton's failure to do so was inconsistent with industry standards and, thus, is bad faith.

Hamilton's conduct was inconsistent with industry practices and in violation of its own written policies and procedures. Mahoney, DSI's banking expert, testified that in connection with the Jennico Loan, Hamilton did not act in accordance with industry standard, in a reasonable or prudent way, in good faith, or in compliance with Hamilton's own credit policies. Most significantly, Mahoney testified that it was unreasonable and imprudent for Hamilton not to have contacted NationsBank, given the undisputed facts that (i) Model was Hamilton's primary source of repayment and (ii) Hamilton was aware that Model was subject to borrowing restrictions under its agreement with the Bank Group. As Mahoney observed, Hamilton should have contacted NationsBank, if for no other reason than to ensure that the very execution of the Commitment Letters did not put Model—Hamilton's primary source of repayment—into an immediate default with NationsBank.

Mahoney testified that, given these facts and the multimillion dollar amount of both credit relationships, the "most elementary form of due diligence" would have required

Hamilton to contact the responsible loan officer at NationsBank to discuss the proposed Jennico loan and the Bank Group covenants. Mahoney concluded:

> I can't envision any circumstances under which a bank who's acting prudently and in good faith, would [make the Jennico loan] without contacting [NationsBank]. It's so fundamental.

The Court's conclusion that Hamilton did not act in good faith is reinforced by the testimony of Hamilton's own representatives and experts. Oscar Souffront ("Souffrant") was general counsel to Hamilton Bank from 1991 to 1996. Souffront testified that:

> [E]very time you're lending to a borrower who already has a credit relationship, you always advise your client to make sure to look into the negative covenants that may apply pursuant to the existing loan relationship. That's Banking 101, Lending 101.

It is undisputed that despite its knowledge of the existence of negative covenants, Hamilton never asked Model or NationsBank for a copy of the Loan Agreement or otherwise made inquiry about the specifics of the covenants. Thus, according to its own general counsel at the time of the subject transaction, Hamilton violated "Banking 101" by not contacting NationsBank.

Hamilton's own banking expert, Marc Lipsitz ("Lipsitz"), acknowledged that it was unreasonable, unusual, and "out of the norm" that Hamilton did not make any inquiry of the Bank Group. He noted that Model's relationship with Jennico was not an arm's length transaction and stated that if he had been advising Hamilton on the Jennico transaction, he would have wanted to review the Loan Agreement.[21]

---

21. Lipsitz's testimony contrasted sharply with that of Hamilton's other banking expert, Aguerrebere, who testified that Hamilton's handling of the Jennico Loan was "ordinary and typical." The Court did not find Aguerrebere's expert testimony credible. As previously noted, he testified that he saw no relationship between the transactions described in Bernace's April 28, 1995 memorandum and Bernace's May 2, 1995 memorandum. He also testified that the relationship between NationsBank and Model was "totally irrelevant" to Hamilton in making the Jennico Loan and compared it to a lender to Micro-

Finally, Bernace's memorandum of August 5, 1994 acknowledges Hamilton's responsibility to notify the Bank Group of any loan to Model. The Jennico Loan was clearly structured to attempt to circumvent this responsibility to notify the Bank Group.

It is apparent from the record that Hamilton did not contact NationsBank because (i) it did not want to alert NationsBank that it was lending money to Jennico who was doing business with Model; (ii) it wanted to preserve the ability to profess ignorance of the specifics of the negative covenants; and (iii) it wanted to avoid receiving an express unequivocal communication from NationsBank that the Jennico transaction violated the Loan Agreement. As stated by Hamilton's fraud expert, Mr. Plave, a call from Hamilton to NationsBank could have caused NationsBank to "interfere" with Hamilton's business opportunity by causing Model not to deal with Hamilton.

Bernace testified that it was Model's choice whether to borrow from Hamilton in its own name or to borrow in the name of Jennico. This testimony is significant because Bernace acknowledged that if Model had been the borrower, then Hamilton would have contacted NationsBank to work out an intercreditor agreement. Hamilton's argument that the decision to interpose Jennico as the nominal "borrower" relieved it of an obligation to contact NationsBank is unpersuasive, particularly in light of the testimony of Souffront, Mahoney, and Lipsitz.

Bernace testified that Model was Hamilton's primary source of repayment and that he knew that Model had a $65 million line of credit with NationsBank. He testified that it would therefore be "significant" to know what NationsBank's experience as Model's lender had been. He acknowledged that "any banker" in NationsBank's

position would want to know about the irrevocable Commitment Letters. Yet Hamilton failed to contact NationsBank even though its loan officer on the account, Carmen Alvarez, had previously worked on the Model account during her previous employment at NationsBank.

■■■ Willful ignorance of a debtor's fraudulent purpose is equally fatal to a § 548(c) or § 550(b)(1) defense, as is willful ignorance of pending insolvency. *See, e.g., In re Cannon,* 230 B.R. 546, 592 (Bankr.W.D.Tenn.1999) (finding that transferee may not put on blinders where circumstances place it on inquiry notice "of the debtor's fraudulent purpose or insolvency").

This was not an ordinary business transaction, and Hamilton, despite obvious knowledge of facts that would suggest the fraudulent purpose of the transaction, elected to close its eyes and not undertake reasonable and prudent investigation.

In view of the foregoing analysis, this Court finds that Hamilton's conduct was inconsistent with a finding of good faith, especially where Hamilton's own witnesses have testified that Hamilton's conduct was unreasonable, imprudent, unusual, out of the norm, and in violation of "Banking 101." Hamilton's conduct with respect to the Jennico Loan does not rise to the level warranting this Court's protection under 11 U.S.C. § 550(b).

## F. Hamilton Was Not a Mere Conduit

With respect to the two $900,000 checks, Hamilton does not dispute that it received the monies, but Hamilton argues that because the two $900,000 checks were used to satisfy the third-party investors' loans, Hamilton was a mere conduit for these funds since they were immediately credited to certain third-party participants [22] in

soft making inquiry about Apple's banking relationships.

**22.** The third-party investors were Southern Bank & Trust Company, Limited ("SBT"),

Roberto Stahl, and Rodolfo Stahl. Each of these third parties had extensive relationships with Hamilton; two are former founding shareholders of Hamilton. SBT was a cus-

the Jennico Loan. Hamilton asserts that it lacked dominion and control over the two $900,000.00 checks and that it should accordingly not be held liable as a transferee of these funds.

The plain language of § 550 provides no exception for liability for a transferee who is a "mere conduit." Under a literal application of § 550, any entity that receives a "transfer" is a "transferee." Recognizing that this logical construction of the statute may sometimes lead to inequitable results, some courts have created an equitable exception for certain entities who are technically transferees, but who in reality are "mere conduits" of the transferred property.

▮▮▮▮▮ The "mere conduit" defense immunizes a good faith recipient of an otherwise avoidable transfer who acts as a mere intermediary and who cannot exercise dominion or control over the transferred property, where equitable principles justify such an exception. *See, e.g., Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir.1987); *In re Harbour*, 845 F.2d 1254, 1257 (4th Cir. 1988) (finding that in order for court to find that initial recipient of transfer was mere conduit and not initial transferee (as defined by § 550(a)(1)), court must find that recipient did not act inequitably or in bad faith). However, a transferee who does not act in good faith can never be deemed a "mere conduit." *See Harbour*, 845 F.2d at 1258.

In *Harbour*, the Fourth Circuit held that a defendant seeking to avoid liability as a § 550 transferee must show not only that it acted as a commercial or mere conduit but also that it acted in good faith. This follows from the fact that the request to be deemed a mere conduit is equitable

in nature. *See id.* at 1257. In *Harbour*, an individual debtor transferred funds to his best friend's mother, who held the funds for at most a day and then transferred the funds to her son. The trustee sued the mother as an initial transferee. She argued that she was a mere conduit.

The Fourth Circuit considered other decisions which held that true "technical" transferees are sometimes spared a literal interpretation of § 550(a)(1) where they establish themselves as mere conduits. The court noted that most of these cases involve commercial enterprises, including banks, where there were no allegations that "the defendants' handling of the debtor's funds in any way departed from their normal handling of commercial transactions." *Id.*

The Fourth Circuit noted that there were no reported cases according "mere conduit" protection to a transferee who was found to have acted in bad faith. The court held that a defendant asking a court to ignore the literal meaning of § 550(a)(1) on equitable grounds must have acted in good faith. *See id.* at 1258 (holding that debtor's mother did not act in good faith and was, therefore, not entitled to a finding that she was a "mere conduit").

In an unpublished decision, Judge Mark followed *Harbour* and likewise held that in order to escape transferee status, a defendant must (i) establish that it was a mere conduit *and* (ii) prove that it acted in good faith. *See In re Data Lease Fin. Corp. (Kapila v. Funding, Inc., et al.)*, Case No. 92–30774–BKC–RAM, Adv. No. 94–0864–BKC–RAM–A (Bankr.S.D.Fla. January 23, 1995).

In *Data Lease*, Judge Mark held that a court must consider in each case whether

tomer of Hamilton, maintaining depository accounts, making overnight investments, participating in loans, and purchasing trade acceptances and bankers acceptances. In 1995 alone, SBT purchased millions of dollars of drafts from Hamilton. Hamilton's chairman, Masferrer, and his wife at one time each served as directors for SBT. Roberto Stahl

and his brother Rodolfo Stahl are founding shareholders of Hamilton and have been Hamilton customers for ten years. In addition to maintaining depository accounts at Hamilton, the Stahls have purchased millions of dollars in banker's acceptances, loans and trade drafts from Hamilton.

the circumstances justify application of the mere conduit exception. *See id.* at 8. Citing *Harbour,* the court held that the recipient must have acted in good faith to avoid a technical reading of § 550(a)(1):

> The conduit exception case law can be read as creating a narrow "good faith" equitable defense not provided to initial transferees by the express language of § 550 ... The circumstances in which the conduit exception is appropriately applied reflect an assumption that the conduit is acting in good faith and without knowledge.

*Id.* at 9 n. 2.

Again referring to *Harbour,* the court noted that "[a]t least one circuit has held that a recipient of the debtor's property asserting a conduit defense must have acted in good faith to be spared the effects of recovery under § 550. The Eleventh Circuit's reference to equity suggests the same considerations." *Id.* at 9 (internal citation omitted). Judge Mark was referring to *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196 (11th Cir.1988), where the Eleventh Circuit noted the "equitable concepts underlying bankruptcy law" and that "equitable principles govern the exercise of bankruptcy jurisdiction." *Id.* at 1199.

Judge Mark held that the Eleventh Circuit's ruling in *Societe Generale* requires a determination of whether the facts and circumstances justify allowing an entity to invoke the mere conduit defense. *See In re Data Lease Fin. Corp. (Kapila v. Funding, Inc., et al.),* Case No. 92–30774–BKC–RAM, Adv. No. 94–0864–BKC–RAM–A (Bankr.S.D.Fla. January 23, 1995). These authorities demonstrate that the "dominion and control" test used for determining whether an entity is a transferee also involves a consideration of equitable principles, including the good faith of the party asserting the defense.

Other bankruptcy and district court judges in this district have agreed with Judge Mark. *See, e.g., Metsch v. First Alabama Bank of Mobile (In re Colombian Coffee Co.),* 75 B.R. 177, 179–80 (S.D.Fla.1987) (holding that when determining whether a bank is a transferee, a court is "empowered to employ equitable principles in interpreting and applying § 550(a) to the facts of th[e] case"); *Metsch v. National Bank of Miami (In re Colombian Coffee Co.),* 64 B.R. 585 (Bankr. S.D.Fla.1986); *Metsch v. First Alabama Bank of Mobile (In re Colombian Coffee Co.),* 59 B.R. 643, 645 (Bankr.S.D.Fla.1986) (finding that § 550 was not "intended to make an *innocent* link in the commercial chain bear the loss of a fraudulent" transfer (emphasis added)).

Consistent with the Court's finding that Hamilton did not act in good faith, the Court finds that Hamilton may not assert that it was a mere conduit for the two $900,000 payments and that Hamilton was the subsequent transferee of the two $900,000 payments.[23] Hamilton is not entitled to a good faith defense to the two $900,000 checks under 11 U.S.C. § 550(b) as the subsequent transferee of those funds.

### G. Post–Petition Transfers

■ After Model filed bankruptcy, Hamilton liquidated Jennico's remaining inventory subject to Hamilton's lien and received proceeds of $1,268,152.90. DSI argues that it is entitled to recover this amount from Hamilton as a post-petition transfer pursuant to 11 U.S.C. § 549. DSI's claim for avoidance of post-petition transfers is based on the theory that the Jennico Loan was a disguised loan to Model and that the inventory was property of Model's estate. Hamilton argues that the inventory was not property of Model's estate but was the property of Jennico, and

---

**23.** Because Hamilton's lack of good faith precludes a finding that Hamilton was a "mere conduit," Hamilton's status as an initial or subsequent transferee of the two $900,000.00 checks does not affect the avoidability or recovery of the two $900,000 checks because good faith is also a necessary element of either a § 548(c) or a § 550(b) defense.

therefore, Hamilton has no liability under § 549.

Section 549 states that "[e]xcept as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—(1) that occurs after the commencement of the case; and (2) . . . (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a). Subsection (b) refers to transfers made during the "involuntary gap," that is, the period between the filing of the petition and the date that the order for relief is entered in an involuntary case. Subsection (c) refers to transfers of real property to good faith purchasers for present fair equivalent value and without knowledge of the commencement of the case.

In order to be an avoidable post-petition transfer under § 549, then, the two requirements are that there be a transfer of property of the debtor's estate and that the transfer of estate property occur after the bankruptcy petition has been filed. *See* 11 U.S.C. § 549(a); *see also Kapila v. Atlantic Mortgage and Inv. Corp. (In re Halabi),* 184 F.3d 1335, 1337–38 (11th Cir. 1999) (finding that trustee's avoiding powers under § 549 extend only to the debtor's interest in estate property transferred after the commencement of the case).

Federal Rule of Bankruptcy Procedure 6001 states that "[a]ny entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." *But see In re Calstar, Inc.,* 159 B.R. 247 (Bankr.D.Minn.1993) (finding that in order to avoid a transfer under § 549, the trustee must prove that there was a post-petition transfer of estate property not authorized by the Bankruptcy Code or by the court).

In order for DSI to recover the value of the liquidated inventory from Hamilton, the two requirements must be proven. First, the inventory must have been property of Model's estate, and second, the inventory must have been liquidated after the commencement of Model's bankruptcy. Model filed its voluntary petition on July 18, 1996, and Hamilton liquidated all of the inventory between October of 1996 and June of 1997. Thus, the inventory was liquidated post-petition. The only issue, then, is whether the inventory were property of Model's estate at the time Hamilton liquidated the inventory.

Section 541(a)(1) defines property of the estate as "[e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

The Court finds that DSI did not meet its burden of proving that the inventory liquidated post-petition was property of Model's estate. The inventory was purchased with Jennico's funds or was exchanged for Model's inventory. There was no allegation that these exchanges were fraudulent conveyances. Although Model had ready access to Jennico's inventory, Model did not treat the inventory as its own property. Model issued purchase orders for the inventory, which were delivered to Jennico, who would in turn request a release from Hamilton of the inventory from the Daher–Golden Eagle Warehouse. Once Hamilton issued the release of the inventory requested, Jennico would then issue an invoice to Model for the inventory. Upon payment by Model to Jennico for the inventory, it would be released from the Daher–Golden Eagle Warehouse. There was no evidence that the inventory were ever in any name other than in Jennico's name.

Furthermore, Model did not list the Jennico inventory on its bankruptcy schedules as property of its estate. The Bank Group had knowledge of the existence of the Jennico inventory beginning in October of 1995. No party in interest contested Model's omission of the Jennico inventory in its bankruptcy schedules or its monthly borrowing base certificates provided to the Bank Group post-petition. The inventory was not included in Model's Disclosure Statement or Model's Plan of Reorganiza-

tion, proposed by Model and its Unsecured Creditors Committee and supported by the Bank Group. The inventory was insured by Jennico with Hamilton listed as the loss payee. Also, Hamilton filed a UCC–1 Financing Statement as a security for its advances to Jennico. Neither the Model/Bank Group forbearance agreement nor the Jennico/Hamilton forbearance agreement referred to Jennico's inventory as being property of Model; to the contrary, the Jennico/Hamilton forbearance agreement referred to the inventory as being property of Jennico. The Bank Group had knowledge of the Jennico/Hamilton forbearance agreement and never objected to its terms.

Therefore, the Court finds that DSI has failed to meet its burden of proof that the inventory liquidated by Hamilton after the commencement of Model's bankruptcy was property of Model's estate. The liquidation of the Jennico inventory, then, is not an avoidable post petition transfer under § 549, and DSI is not entitled to recover the value of the liquidated inventory, $1,268,152.90, from Hamilton.

### H. Hamilton's Proof of Claim in Model's Estate

Hamilton filed a proof of claim in Model's estate in the amount of $1,981,715.84, based upon unpaid trade drafts executed by Model to Jennico and endorsed by Jennico to Hamilton. DSI filed an objection to Hamilton's proof of claim but did not introduce any evidence that disputed the amount or validity of Hamilton's claim.

Under 11 U.S.C. § 502(d), "the court shall disallow any claim of any entity from which property is recoverable under section ... 550 ... of this title or that is a transferee of a transfer avoidable under section ... 548 ... of this title, unless such entity or transferee has paid the amount, or turned over such property, for which such entity or transferee is liable under section ... 550 ... of this title."

The Court finds that the objection to claim is overruled, but that pursuant to 11 U.S.C. § 502(d), Hamilton's proof of claim is disallowed unless Hamilton had paid the amount for which Hamilton is liable to DSI for avoidable transfers under §§ 548(a)(1) and 550(b).

### I. Equitable Subordination

■ Under 11 U.S.C. § 510(c), a claim can be subordinated to other claims under the principles of equitable subordination. The elements of equitable subordination are (i) inequitable conduct by the claimant which has (ii) injured another creditor or given an unfair advantage to the claimant, if (iii) subordination is not inconsistent with Bankruptcy Code. *See In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990); *see also Matter of Lemco Gypsum Inc.*, 911 F.2d 1553, 1556 (11th Cir.1990).

■ For all of the same reasons that the Court finds that Hamilton did not act in good faith, the Court finds that Hamilton's conduct in connection with its loan to Jennico was inequitable. Hamilton indirectly loaned money to Model via Jennico when Hamilton knew that a direct loan to Model may be prohibited. Bernace acknowledged that negative covenants are common features of loan documents and that negative covenants serve a legitimate purpose by assisting lenders in controlling their credit risk. Nonetheless, as detailed herein, Hamilton facilitated Model's scheme to borrow money in derogation of the Bank Group's rights, thereby giving Hamilton an unfair advantage.

If Hamilton had acted in accordance with industry standards by notifying the Bank Group of its loan to Jennico, Hamilton's claim may have been contractually subordinated to the Bank Group's claim. Therefore, it is certainly consistent with the policies of the Bankruptcy Code to equitably subordinate Hamilton's allowed claim, if any, to Model's allowed unsecured

claims, and the Court finds that such subordination is appropriate.[24]

### ORDER

In accordance with the foregoing Findings of Fact and Conclusions of Law and with the Court being otherwise fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that:

1. Pursuant to 11 U.S.C. §§ 548(a)(1) and 550, DSI is entitled to avoid fraudulent transfers from Model to Hamilton in the amount of $2,448,147.72, and the Court shall enter judgment in favor of DSI and against Hamilton in the amount of $2,448,147.72.

2. DSI's objection to Hamilton's proof of claim is **OVERRULED**, but Hamilton's allowed claim in Model's estate shall be equitably subordinated to the unsecured claims of the Bank Group.

3. DSI is not entitled to recover any post-petition transfers under 11 U.S.C. § 549 from Hamilton, and the Court shall enter judgment in favor of Hamilton and against DSI on the claim for post-petition transfers.

4. DSI's request for attorneys' fees and costs is **DENIED.**

5. Pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure, this Court will enter a separate Final Judgment consistent with these Findings of Fact and Conclusions of Law. Prejudgment interest will be allowed from January 13, 1998, the date of commencement of the above-captioned Adversary Proceeding.

---

24. According to the Pretrial Order, one of the issues of law to be litigated in this trial was whether Hamilton were a holder in due course and, therefore, not subject to equitable subordination. Under § 3–302 of the Uniform Commercial Code, a holder in due course is defined as a holder who takes an instrument for value; in good faith; and without notice that (a) the instrument is overdue or has been dishonored, (b) the instrument contains an unauthorized signature, (c) there is a claim to the instrument, or (d) any party has a defense or claim in recoupment. In § 3–103(a)(4), the Uniform Commercial Code defines good faith as honesty in fact and the observance of reasonable commercial standards of fair dealing. Consistent with this Court's finding that Hamilton did not act in good faith, Hamilton is not a holder in due course, and therefore Hamilton is subject to equitable subordination.